29 Mass. App. Ct. 424 (1990)
560 N.E.2d 749
INTERNATIONAL TOTALIZING SYSTEMS, INC.
vs.
PEPSICO, INC.
No. 89-P-229.
Appeals Court of Massachusetts, Middlesex.
February 15, 1990.
October 18, 1990.
Present: BROWN, PERRETTA, & FINE, JJ.
Joseph D. Steinfield (Michael D. Weisman with him) for the plaintiff.
Toni G. Wolfman for the defendant.
BROWN, J.
We are asked to answer the twin essential questions: What did PepsiCo know and when did it know it? We must also decide whether in the rough and tumble world of commerce the manner and morals of the marketplace have been offended in a legally cognizable manner.
As a by-product of the now famous battle between Coke and Pepsi, the so-called "cola war," in 1978, the defendant, PepsiCo, Inc. (PepsiCo), decided to implement a new, fully electronic vending machine called the X-Vendor. In 1979, PepsiCo selected three companies to manufacture different parts of the machine: LaCrosse Cooler Co. was to manufacture the machine itself; Mars Money Systems (Mars), a division of M & M Mars, Inc., was to design and manufacture the coin mechanism; and the plaintiff, International Totalizing Systems, Inc. (ITS), was to manufacture the "controller" or electronic brain of the machine. Soon thereafter, PepsiCo entered into separate contracts with each manufacturer, including ITS.
The agreement between ITS and PepsiCo consisted of both a research and development phase and a manufacturing and production phase. When ITS proceeded to develop the controllers, a variety of problems soon emerged. PepsiCo eventually suspended the project in April, 1981, never having advanced past the research and development phase of the project. PepsiCo alleged that the failure of the controller to function properly effectively precluded the development of the X-Vendor project, while ITS alleged that PepsiCo suspended the project when it realized that manufacturers would not be willing to pay fees for the right to manufacture vending machines containing controllers and PepsiCo's franchisees were unwilling to pay additional amounts for vending machines containing controllers. The jury, in answers to special *426 questions, found that ITS was not in breach of the contract by failing to produce a controller meeting the specifications of the contract and that the controller was not negligently designed.
The focus of this dispute involves the projections in 1980 of the number of controllers that would be required when the project was apparently still a successful one. Section 9(a) of the contract required PepsiCo to use its "best efforts" to provide to ITS monthly projections of what its controller requirements would be nine months in advance. ITS, in turn, was required to notify PepsiCo of its ability to meet the projected needs. If ITS did not have the capacity to manufacture the units, PepsiCo had the right to go to a second source. ITS presented evidence which showed that on numerous occasions PepsiCo's director of commercial development, Salvatore Porrazzo, and other PepsiCo officers deliberately overstated the anticipated controller requirements for 1981. By letter dated May 29, 1980, PepsiCo indicated projected requirements for a total of 19,000 controllers[1] in the first four months of 1981.[2] In addition, Porrazzo, who had overall responsibility for the X-Vendor project, told ITS president Peter Lillios that between 45,000 and 50,000 controllers would be required for the whole of 1981.[3] PepsiCo admits that Porrazzo "thought [the projections given to ITS] were overly optimistic and maintained his personal belief in estimates that he had given ITS during 1979."[4]
*427 Accurate projections became crucial, it is alleged, because, at approximately the same time the projections were given, in early 1980, Mars made an offer to purchase ITS. Mars initially offered to acquire ITS for a guaranteed minimum price of $2.4 million to be paid over three years. On April 21-22, 1980, Mars increased the offer to a guaranteed amount of $3.5 million to be paid over a five-year period.[5] ITS, however, never accepted the offer.
At bottom of ITS's four-count complaint against PepsiCo for damages is its assertion that it rejected Mars's lucrative offer because its own calculations of the value of the company (and thus the price it was willing to accept) were inaccurately inflated by the high controller projections. Count I alleges deceit and misrepresentation. Counts II and III allege breach of contract, and Count IV alleges violations of G.L.c. 93A, § 11. In response, PepsiCo filed an answer and counterclaim alleging breach of contract and negligence in connection with ITS's design and development of the product under the contract.[6]
In August of 1986, a judge of the Superior Court allowed PepsiCo's motion for summary judgment on several of ITS's *428 claims.[7] At trial, ITS pursued only its claim for "lost corporate opportunity resulting from its rejection in April, 1980, of an offer by Mars to acquire its assets"  a rejection which it said would not have occurred but for its reliance upon PepsiCo's fraud, misrepresentations, and breach of contract.
At the conclusion of the trial, in answer to special questions, the jury found (1) that PepsiCo knowingly made misrepresentations; (2) that ITS reasonably relied on PepsiCo's knowingly false representations and material omissions; (3) that the misrepresentations caused or substantially contributed to ITS's decision to reject the Mars offer; (4) that ITS suffered a financial loss as a result of rejecting the Mars offer; (5) that the loss was reasonably foreseeable; and (6) that PepsiCo had actual knowledge of the offer. The jury also found that PepsiCo was in breach of its contract with ITS, thereby causing the loss of a favorable opportunity which was reasonably foreseeable when the contract was entered into. The jury awarded ITS damages of $1,650,000. The jury went on to find in favor of ITS on PepsiCo's counterclaims.
PepsiCo moved for judgment notwithstanding the verdict. See Mass.R.Civ.P. 50, 365 Mass. 814 (1974). The judge allowed PepsiCo's motion in major part, ruling as matter of law that it was not reasonably foreseeable by the parties, or actually within their contemplation at the time the contract was entered into, that ITS would sustain the alleged losses as a result of PepsiCo's breach of contract. The judge concluded that "[t]here was no evidence that PepsiCo either knew that such a loss would be considered an element of ITS's damages if the former breached the contract, or that there were any circumstances from which PepsiCo should have known of such probable future contention."
The judge similarly ruled, with respect to the tort claims, that the alleged loss was not reasonably foreseeable by PepsiCo *429 because the evidence was legally insufficient to warrant the jury's answer that PepsiCo was aware or should have been aware of the Mars offer before May 5, 1980, the date it expired.[8] At that time, the judge issued findings of fact and conclusions of law and a memorandum of decision on ITS's G.L.c. 93A claim. The judge found that PepsiCo had violated c. 93A but ruled that PepsiCo's violations were not wilful or intentional, and he again concluded that ITS sustained no recoverable damages. This appeal and cross-appeal are from the ensuing judgment.
1. ITS's claims for breach of contract and misrepresentation and deceit.
a. Standard of review. The standard of review to be used on PepsiCo's motion for judgment notwithstanding the verdict on Counts I and II of ITS's complaint[9] "is the same as that on a motion for a directed verdict." D'Annolfo v. Stoneham Hous. Authy., 375 Mass 650, 657 (1978). In reviewing the grant of a judgment notwithstanding the verdict, we must determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." Poirier v. Plymouth, 374 Mass. 206, 212 (1978). See Hall v. Horizon House Microwave, Inc., 24 Mass. App. Ct. 84, 89-90 (1987). However, "[t]he inferences must be reasonable and must be based on probabilities rather than possibilities and may not be the result of mere speculation and *430 conjecture." Goffredo v. Mercedes-Benz Truck Co., 402 Mass. 97, 101 (1988).
b. Breach of contract. On Count II of the plaintiff's complaint, the jury found that PepsiCo committed a breach of its contract with ITS and that ITS's loss of the corporate opportunity to sell its assets to Mars was a reasonably foreseeable consequence of the breach. The judge, however, ruled that the loss was not foreseeable as of the date (December 26, 1978) upon which the contract was entered into.
It is undisputed that, if a party suing for breach of contract has sustained a loss as a result of a breach, and the loss is of such a nature that it was reasonably foreseeable by the parties and follows as a natural consequence and proximate result of the breach or was actually within their contemplation at the time the contract was entered into, the loss may be recovered in an action for damages. Leavitt v. Fiberloid Co., 196 Mass. 440, 446-448 (1907). American Mechanical Corp. v. Union Mach. Co. of Lynn, Inc., 21 Mass. App. Ct. 97, 101 (1985), and cases cited. ITS argues that the Mars offer was the type of collateral transaction which was reasonably foreseeable at the time of the contract. Evidentiary support for that contention is conspicuously lacking.[10] On this record, we think it is not possible to draw fairly an inference that, at the time the parties made the agreement, it was reasonably foreseeable that, if PepsiCo caused or committed a breach of that contract, ITS might be induced to reject a lucrative acquisition offer. The damages were simply too remote to have been within the reasonable contemplation of the parties at the time the contract was executed. See Abrams v. Reynolds Metals Co., 340 Mass. 704, 709 (1960).
c. Misrepresentation and deceit. On Count I of ITS's complaint, the jury found that PepsiCo knowingly misrepresented and failed to disclose material facts to ITS and that ITS reasonably *431 relied on the misrepresentations, all of which substantially contributed to ITS's decision to reject the Mars offer.
The jury's findings on causation mirror the principle that, to recover in an action for deceit, "the plaintiff must prove `that the defendant [or its agent], made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [its] damage.'" Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982)(citations omitted). See also Restatement (Second) of Torts § 525 (1977)("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation"). PepsiCo does not argue that there was insufficient evidence for the jury to find that the inflated projections caused ITS to reject the Mars offer;[11] rather, PepsiCo argues that "[r]ejection of the Mars offer was not a reasonably foreseeable consequence of PepsiCo's projections."[12]
*432 In its answers to special questions, the jury specifically found that, "[a]t the time in April 1980 when PepsiCo gave its projected figures of controller requirements to ITS, [it was] reasonably foreseeable by PepsiCo that a probable result of a misrepresentation by PepsiCo as to those figures ... would be ITS's loss of a favorable opportunity to sell its business to a third party."[13] In granting PepsiCo's motion for *433 judgment notwithstanding the verdict, the judge also focused on whether the loss of the Mars sale was "a reasonably foreseeable consequence of [the] misrepresentation by PepsiCo...." Concluding that there was insufficient evidence of actual or imputed knowledge on the part of PepsiCo of the prospective sale to Mars, the judge held that the sale was not reasonably foreseeable. We agree with ITS that the judge erred in ruling that PepsiCo lacked knowledge of the Mars offer to acquire ITS, and, as this was the sole basis upon which he granted judgment notwithstanding the verdict in favor of PepsiCo on the misrepresentation count, the judgment on Count I should be reversed.
ITS points to two pieces of evidence which it claims show that PepsiCo had knowledge of the Mars offer to purchase ITS: the testimony of Donald Simon, PepsiCo's manager of marketing equipment development, and the testimony of Ray Martino, a Mars vice president. The judge ruled that there was no evidence that Simon's authority extended over any matter to which knowledge of the Mars offer was pertinent, and thus the jury could not properly have found that PepsiCo knew or should have known of the Mars offer. It is well settled that, "[w]hen an agent acquires knowledge in the scope of her [or his] employment, the principal... is held to have constructive knowledge of that information." DeVaux v. American Home Assur. Co., 387 Mass. 814, 818 (1983), citing Union Old Lowell Natl. Bank, 318 Mass. 313, 323-324 (1945), and Bockser v. Dorchester Mut. Fire Ins. Co., 327 Mass. 473, 477-478 (1951). In Bockser, the court stated that notice to, or knowledge of, an agent, in the course of the transaction in which he is acting for his principal, is constructive notice to, or knowledge of, the principal. 327 Mass. at 477-478. This rule does not apply unless the agent having the knowledge has within the scope of his authority the matter *434 with respect to which that knowledge is important. Stetson Press v. Bunsen Oil Burner Corp., 285 Mass. 291, 293 (1934). See also Wurm v. Allen Cadillac Co., 301 Mass. 413, 416 (1938).
While this is a close case, the jury, drawing all reasonable inferences for the plaintiff from the evidence before it, could have found that Simon learned of the Mars offer while acting in the course of his PepsiCo duties on the X-Vendor project and thus learned of the offer within the scope of his employment while acting on a matter in which the knowledge was important.[14] See Fahey v. Rockwell Graphic Sys., Inc., 20 Mass. 642, 654 (1985) (the scope of an employee's employment is not restrictively construed). This is particularly true given the fact that Mars itself was also working on the project (i.e., producing the coin mechanism) at the time the information was communicated to Simon. The two parts of the machine, one produced by Mars, the other by ITS, were required to work together once incorporated into the machine, and an acquisition of ITS by Mars would have had a discernible impact on ITS's production capabilities and financial strength. Both of those matters were of concern to PepsiCo. Over-all, an acquisition of ITS by Mars would undoubtedly have had a substantial impact on the X-Vendor project. This created an issue that was properly for the jury. See DeVaux v. American Home Assur. Co., 387 Mass. at 819.
We conclude that there was sufficient evidence in this case for the jury to find that in making the inflated projection it was foreseeable that ITS would lose the opportunity to sell its business to Mars.[15] PepsiCo knew that Mars was negotiating *435 with ITS to acquire ITS's assets[16] and should have foreseen that its projections might affect the value of ITS or its attitude towards the sale. Certainly, it would be reasonable for ITS to take into consideration the number of controllers it would be manufacturing in the next year in deciding whether to accept an acquisition offer, and whether it did so was a question of fact.[17] That other factors may have contributed to the decision to reject the Mars offer is not material as long as the inaccurate controller projections were an operating factor. Saunders v. Goodman, 8 Mass. App. Ct. at 616.
2. ITS's claim under G.L.c. 93A. On ITS's claim for damages under G.L.c. 93A (Count IV) the judge made his own findings of fact and conclusions of law and issued a separate memorandum of decision. He found that "PepsiCo has been guilty of an unfair and deceptive act toward ITS, within the purview of G.L.c. 93A, § 11." However, the judge also incorporated, from his decision on the previous claims, his reasoning on the causation issue, that, "[a]bsent actual (or imputed) knowledge of a prospective sale of ITS corporate assets to Mars, ... [the loss] was not reasonably foreseeable," and he went on to conclude "that ITS has suffered no legally recoverable damages under Count IV." He did, however, award ITS attorney's fees in the amount of $375,000, plus interest. For various reasons, both ITS and PepsiCo have appealed these rulings on Count IV.
Given the posture of this case, which included both common law actions and a statutory claim, the judge had the option of "letting the jury find the facts for both claims, reserving to himself all aspects of the 93A claim, or asking for a non-binding advisory" as to the latter. Acushnet Fed. Credit Union v. Roderick, 26 Mass. App. Ct. 604, 606 (1988), and cases cited. Here, the judge stated that "[b]efore *436 trial I advised the parties that I would determine the issues presented by Count IV; that I recognized that I was not bound by the jury's answers to any G.L.c. 93A questions, but that I would accord such answers respectful attention and deference." The judge, therefore, was not bound by the jury's findings that pertained to the c. 93A claim, and he was entitled to make his own findings and rulings.
In this case, however, in his memorandum and decision on the 93A claim, the judge stated that, if he was "in error in ... ruling that ... as a matter of law the loss of the Mars sale was not an element of damages for which PepsiCo was responsible under the circumstances, then I ... adopt the jury's finding as to the amount of damages suffered by ITS as a result of that loss." A similar statement was appended to the judge's findings on the misrepresentation count. We read these statements as revealing the judge's intention that, should an appellate court disagree with his conclusions as to the foreseeability of the harm, his decision would be to echo the jury's findings as to damages in both the misrepresentation and c. 93A claims.[18] Having decided that the judge was mistaken in concluding that "the loss of the Mars sale was not an element of damages for which PepsiCo was responsible under the circumstances," it follows that damages should have been awarded as to the c. 93A claim.[19] The judge's *437 award of attorneys' fees can therefore stand.[20] Interest on the portion of the award representing attorneys' fees should, however, be calculated from the time judgment was entered on the c. 93A claim (June 8, 1988), not from the time the complaint was filed. Patry v. Liberty Mobilehome Sales, Inc., 394 Mass. 270, 272 (1985).
In his decision on G.L.c. 93A, the judge also made clear that in no event were "double or treble damages ... justified on the facts of this case" given the absence of "wilful or intentional conduct within the purview of G.L.c. 93A." Based on the entire record, we see no reason to disturb this aspect of the judgment. Cf. Bachman v. Parkin, 19 Mass. App. Ct. 908, 910 (1984). Contrast Computer Sys. Engr., Inc. v. Qantel Corp., 571 F. Supp. 1365, 1373-1378 (D. Mass. 1983), affd., 740 F.2d 59 (1st Cir.1984). We note that this conclusion may have been based in part on the absence of any evidence that PepsiCo acted with the intention of killing the Mars sale. Further, ITS's claim could not have been termed "clearly valid," such that multiple damages should have been awarded as punishment for forcing ITS to litigate. *438 See Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 627-628 (1978); International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 857 (1983).
3. PepsiCo's motion for a new trial. Finally, PepsiCo argues that the trial judge improperly denied its motion for a new trial. See Mass.R.Civ.P. 59, 365 Mass. 827 (1974). PepsiCo points to, as against the weight of the evidence, the jury's conclusions that ITS did not commit a material breach of the contract by failing to produce a 1980 version of the controller conforming to the original specifications or a 1981 version conforming to the amended specifications.[21]
Whether to grant a motion for new trial typically lies within the sound discretion of the trial judge, and a new trial should not be ordered unless the failure to do so appears inconsistent with substantial justice and affects the substantial rights of the parties. Galvin v. Welsh Mfg. Co., 382 Mass. 340, 343 (1981). See Mass.R.Civ.P. 61, 365 Mass. 829 (1974). In deciding whether there has been an abuse of discretion, we look to see if there are signs of "arbitrary determination, capricious disposition, or whimsical thinking." Davis v. Boston Elev. Ry., 235 Mass. 482, 496 (1920). Egan v. Holderman, 26 Mass. App. Ct. 942, 944 (1988). See also Adams v. United States Steel Corp., 24 Mass. App. Ct. 102, 103-104 (1987). When a claim that a verdict is against the weight of the evidence is asserted (as PepsiCo asserts as to its counterclaims), the trial judge should determine whether the verdict, in his judgment, "is so greatly against the weight of the evidence as to induce in his mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice." Scannell v. Boston Elev. Ry., 208 Mass. 513, 514 (1911). This determination is also addressed to the sound discretion of the trial judge. Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 802 (1987). Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 520-521 (1989). Considering the evidence presented to the jury relative to PepsiCo's counterclaims,[22] *439 we are unable to discern any basis in fact or law for disturbing the judge's refusal to overturn the jury's verdicts. Nor can we conclude, in light of the previous discussion as to the issues raised by Counts I, II, and IV of ITS's complaint, that the trial judge abused his discretion in denying PepsiCo's motion for a new trial as to those counts as well.
The portion of the judgment relating to Counts I and IV is vacated. As to Count I, judgment is to enter reinstating the jury verdict. As to Count IV, judgment is to enter for the plaintiffs. As to all counts, judgment shall enter for the plaintiffs in the amount of $1,650,000. The judge's award of attorneys' fees is affirmed, except interest thereon is to be calculated only from June 8, 1988. The judgment is otherwise affirmed.
So ordered.
NOTES
[1] Two thousand controllers were projected for January, 3,000 for February, 8,000 for March, and 6,000 for April of 1981.
[2] An April 14, 1980, PepsiCo interoffice memo warned of the "risks in serious over/under projections: If [the projection] greatly exceeds the actual quantity, ITS could be put in financial jeopardy.... If [the projection] is far short of the quantities required, X-Vendor production delays could result."
[3] By the terms of the contract, if the research and development program was successful, ITS was assured of the right to make the first 30,000 controllers in each year, provided it could demonstrate the capacity to do so. Under § 8(b) of the contract, PepsiCo had promised that at least 75,000 controllers would be purchased over the period 1981 to 1984, and any shortfall would entitle ITS to certain payments.
[4] The trial judge stated, in his findings of fact on the c. 93A claim, that "Porrazzo did not believe that 19,000 controllers would be required during the first four, or even six, months of 1981, or for that matter, for all of 1981. Nor did he believe that 45,000 controllers would be required during 1981. At no time prior to May, 1980, did Porrazzo tell [ITS] that he did not believe his own projections and representations." The judge also found that prior to May, 1980, PepsiCo failed to disclose to ITS several material facts, including the fact that, in its contract with Mars, PepsiCo guaranteed the purchase of only 7,000 coin mechanisms in 1981 and that PepsiCo believed only ten to twelve thousand X-Vendors at most would be purchased in 1981.
[5] Both offers involved an initial payment representing the value of ITS's tangible and intangible assets (roughly $900,000), followed by a series of annual payments based on sales revenues from controllers for each preceding year, with guaranteed minimum and potential maximum amounts spelled out. The potential maximums were $4.9 million under the first offer and $5.5 million under the later offer.
[6] ITS later added a claim for negligent misrepresentation to its complaint, which was waived at trial. ITS also agreed to a dismissal of its claims for additional rent and financing costs, and it offered no evidence of damage to its reputation as to its parts suppliers or loss of its position as an industry leader. None of these claims was presented to the jury.
[7] The judge ruled that ITS could not recover additional research and development costs and that ITS could recover any lost profits only to the extent provided for by the contract. There was no appeal from that judgment.
[8] The judge also denied PepsiCo's motion for a new trial on Counts I and II of ITS's complaint and on PepsiCo's counterclaims, concluding "that a new trial is not in the best interests of justice" and that "the whole course of my trial rulings insofar as they allowed the jury to pass on various matters which were legally doubtful was shaped to prevent, if possible, a new trial."
[9] The trial judge technically did not grant judgment notwithstanding the verdict on Count II but ruled that the loss was not legally compensable. Because a breach was proved, however, he awarded the plaintiff nominal damages. Nathan v. Tremont Storage Warehouse, Inc., 328 Mass. 168, 171 (1951). Davidson Pipe Supply Co. v. Johnson, 14 Mass. App. Ct. 518, 520-521 (1982).
[10] ITS argues that, faced with the prospect of massive production, sale of the company was one of its limited options and that this option was expressly recognized by the contract provision allowing PepsiCo to terminate the contract if ITS sold its manufacturing business without PepsiCo's consent.
[11] ITS president Peter Lillios testified that he relied on the controller projections in rejecting the Mars offer, and the jury could have believed that he did. See Levy v. Bendetson, 6 Mass. App. Ct. 558, 563-564 (1978); Saunders v. Goodman, 8 Mass. App. Ct. 610, 615 (1979). There was also testimony from Mars vice president Raymond Martino that Lillios rejected the Mars offer because he disliked the president of Mars and because he "thought he was going to end up being very successful with [the X-Vendor project]." Mars, on the other hand, holding more accurate projections, "didn't feel as optimistic as [Lillios] did, either about Pepsi or the rest of his business."
[12] Restatement (Second) of Torts § 531 provides as follows: "One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced" (emphasis supplied).

Comment c to that section explains that "[a] result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." See also Restatement (Second) of Torts § 548A ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance").
[13] There is some question whether foreseeability of the precise or specific harm is required. In Fottler v. Mosley, 185 Mass. 563 (1904), the court held that, "[i]f the defendant [a stockbroker] fraudulently induced the plaintiff to refrain from selling his stock when he was about to sell it, he did him a wrong, and a natural consequence of the wrong for which he was liable was the possibility of loss from diminution in the value of the stock, from any one of numerous causes.... The risk of a fall, from whatever cause, is presumed to have been contemplated by the defendant when he falsely and fraudulently induced the plaintiff to retain his stock." (Emphasis supplied.) Id. at 565-566. The court added that, "[t]o create a liability, it never is necessary that a wrongdoer should contemplate the particulars of the injury from his wrongful act, nor the precise way in which the damages will be inflicted. He need not even expect that damage will result at all, if he does that which is unlawful and which involves a risk of injury." Id. at 565. In David v. Belmont, 291 Mass. 450, 453 (1935), on similar facts, the court stated that, "[w]here a plaintiff suffers pecuniary injury by the fraud of the defendant, the damages recoverable are those which naturally flow from the fraud."

As this court noted in Saunders v. Goodman, 8 Mass. App. Ct. 610 (1979), Professor Prosser refers to the Fottler and David cases "as exceptions to the rule, generally followed by other courts, `restrict[ing] recovery to those damages which might foreseeably be expected to follow from the character of the misrepresentation itself.'" Id. at 617, quoting Prosser, Torts § 110, at 732 (4th ed. 1971). In addition, while the Restatement (Second) of Torts § 548A does place such a foreseeability requirement on recovery of damages in deceit, the Reporter's Note to that section states that "Massachusetts has twice applied a much broader rule of liability holding the defendant for any loss in fact resulting from reliance on the misrepresentation," citing the same two cases cited by Prosser.
Arguably, in using the "natural consequence" language, the Fottler court in effect applied a foreseeability analysis; a stockbroker, in inducing a client not to sell a particular stock, obviously foresees that if the price of the stock should plummet the client will place the blame on the stockbroker. As PepsiCo points out, although the cause of the subsequent drop in value of the stock may have been unforeseeable to the defendants in both cases, the action taken by the plaintiffs in reliance upon the misrepresentations was not only foreseeable but planned. In any event, we need not resolve whether foreseeability is a necessary hurdle in order to impose liability because, as noted, the jury specifically found that the events giving rise to the loss in this case were foreseeable.
[14] Simon testified that Peter Lillios, the president of ITS, had told him "that Mars had offered to buy their company. He didn't explain any of the details of what the offer was, but he told me that it was a lucrative offer." There was also testimony from Raymond Martino, a Mars vice president, that around April, 1980, Mars had "mention[ed]" to PepsiCo that Mars was interested in acquiring ITS and that PepsiCo's response was, "They would be very happy if it happened."
[15] Of course, PepsiCo would also have been liable to ITS if it had acted with the intention of killing the Mars sale. There was, however, no claim that PepsiCo intended that result.
[16] The judge apparently concluded that knowledge of a specific buyer was crucial to a finding of foreseeability; without that knowledge, the issue would be whether PepsiCo should have realized that its misrepresentation would have the effect of killing any potential sale, a question not raised.
[17] See note 11, supra.
[18] To prevail on a claim under G.L.c. 93A, § 11, the plaintiff must show a causal connection between the defendant's unfair and deceptive act and the alleged loss of money or property and that such loss was reasonably foreseeable as a result. See Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 800-801 (1976); International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 850 (1983); Shapiro v. Public Serv. Mut. Ins. Co., 19 Mass. App. Ct. 648, 657 (1985).
[19] PepsiCo argues that the unfair or deceptive acts or practices did not occur "primarily and substantially" in Massachusetts, thus presenting a jurisdictional bar to recovery under c. 93A. We first note that the requirement that "the actions and transactions constituting the alleged ... unfair or deceptive act or practice occur[] primarily and substantially within the commonwealth" is the result of a 1986 amendment, St. 1986, c. 363, § 4. Further, assuming that the issue is properly before us (which is by no means clear), we note that the conduct giving rise to PepsiCo's liability did not consist of a single wrongful act; included in the list of misleading statements and omissions cited by the judge in his findings on c. 93A were acts that occurred in Massachusetts, and liability could be grounded on those acts.
[20] We note, however, that, if the judge's reasoning on causation were to stand, no attorneys' fees could be awarded. Although Shapiro v. Public Serv. Mut. Ins. Co., 19 Mass. App. Ct. at 657, on which the judge relied, could have been read to allow such a recovery, its later clarification in Jet Line Serv., Inc. v. American Employers Ins. Co., 404 Mass. 706 (1989), precludes ITS from recovering attorney's fees. Under Jet Line, "a plaintiff must be entitled to relief in some other respect in order to be entitled to an award of attorneys' fees" under § 11. Id. at 718. The plaintiff must do more than just identify an unfair or deceptive act; the unfair or deceptive conduct "must have had some adverse effect upon the plaintiff, even if it is not quantifiable in dollars." Ibid. The court in Jet Line concluded that Shapiro "reached the proper result on its facts because the defendant's violation of G.L.c. 93A, § 2, caused a loss of money that, on proper proof of the amount, would have entitled the plaintiff to relief and the award of attorneys' fees was within the statute's purpose" (emphasis supplied). 404 Mass. at 718. In the present case, there was not, in the judge's view, a lack of evidence as to the amount of damages (in fact, ITS presented evidence as to the amount of the damages it suffered as a result of its rejection of the acquisition offer), but a failure to show any causal connection between the unfair and deceptive acts and the loss claimed.
[21] PepsiCo also appealed from the Superior Court judge's denial of its motion for a new trial on Counts I, II, and IV and ITS's complaint.
[22] The fact that there was some or even much evidence which would have warranted a contrary verdict is of no consequence. See Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 125 (1986).