WILLIAM BILLINGHAM, trustee in bankruptcy, *vs.* PETER
DORNEMANN.

No. 98-P-2259.

Bristol. November 10, 2000. - June 13, 2002.

Present: ARMSTRONG, C.J., PERRETTA, & BECK, JJ.

*Fraud. Practice, Civil,* Jury trial, Consumer protection case, Special verdict.
*Consumer Protection Act,* Unfair act or practice. *Real Property,* Sale.
*Mortgage,* Foreclosure.

This court concluded that a jury's special verdicts on a claim construed by the
judge as being based exclusively on G. L. c. 93A were not binding on the
judge, where the judge had made it clear on several occasions that the
jury's verdicts were to be advisory and not binding, and the parties did not
object. [172-174]
In an action by a trustee in bankruptcy against the purchaser of a second
mortgage (defendant) on a residential property alleging a violation of G. L.
c. 93A, the judge erred in failing to consider all the relevant circumstances
of the transactions between the owner of the property that had been
foreclosed upon and the defendant; consequently, this court remanded the
matter to the trial judge with instructions that, should the trial judge find
and conclude, after consideration of all the circumstances of the transac-
tions, that the actions of the defendant were unfair, deceptive, and in viola-
tion of c. 93A, the judge should then consider the amount of damages due
and whether the actions were wilful and knowing. [174-179]

CIVIL ACTION commenced in the Superior Court Department on
September 5, 1996.

The case was tried before *John M. Xifaras*, J.

*Patrick T. Matthews (Daniel N. Turcotte* with him) for the
plaintiff.

*Peter Dornemann*, pro se.

PERRETTA, J. In 1994, Dale Mathias was in arrears on the
second and third mortgages on his property. However, neither
holder of those mortgages had threatened him with foreclosure.
Sometime in December of that year or early 1995, the second

mortgagee returned a payment made by Mathias to him and informed him that Peter Dornemann, doing business as Argo Financial Services (Argo), had purchased the second mortgage. Soon thereafter, Dornemann telephoned Mathias and set up a meeting to discuss the possibility of foreclosure and the means by which to avoid it. Mathias met with Dornemann and entered into various agreements with him which he, Mathias, claimed caused him to lose his house in fairly short order. On behalf of Mathias's estate, the trustee in bankruptcy[1] brought an action against Dornemann, alleging fraud, misrepresentation, breach of contract, and violations of G. L. c. 93A. The Superior Court judge construed Mathias's complaint as being based exclusively on c. 93A, treated the jury's special verdicts in favor of Mathias as advisory rather than binding, and ordered judgment for Dornemann. Concluding that because of the parties' assent the judge was not bound by the special verdicts but that he erred in failing to consider all the circumstances of the transactions between Mathias and Dornemann in deciding the c. 93A action, we reverse the judgment.

1. *The evidence.* After reading a magazine advertisement for National Property Associates (NPA), an investment advisory training company, Dornemann became interested in becoming an NPA associate and obtained an NPA brochure. As stated in the brochure, NPA's "prime interest is in the acquisition of real estate at prices far below 'Fair Market Value.' " Its basic concept: "Identify the property, evaluate it, take control of it and sell it at a profit."[2]

His interest piqued, Dornemann, who holds a master's degree in business administration and marketing from the Wharton School of Business at the University of Pennsylvania, enrolled in a three-day training program conducted by NPA. Upon

---

[1]We refer to the trustee and Mathias collectively as "Mathias."

[2]As outlined by NPA, the methodology for taking control of targeted property was: "First, the Associate usually contacts the property owner prior to the publication of any [foreclosure] notices thus avoiding the vast majority of competitors. Second, the Associate typically will be operating from a position of controlling the ultimate disposition of the property. This enables the Associate to hold the attention of the property owner during negotiations. Finally, the Associate utilizes time proven step-by-step methods of correctly finding, controlling and acquiring these properties. This all but eliminates wasted time and effort."

completion of the program, Dornemann created Argo. He chose
the name of his business (Argo Financial Services) because he
intended to offer financial services to lending institutions and, in
some instances, homeowners. Doing business as Argo, Dorne-
mann purchased mortgages and structured contracts with own-
ers of "distressed" property.[3]

Prior to Dornemann's arrival on the scene, Mathias had
owned his house for about thirteen years. The property was
encumbered by three mortgages, which had a total outstanding
balance of about $62,500, and which required total monthly
payments of over $900. A high school graduate who earned his
livelihood as a truck driver, Mathias's weekly net pay was
$335. He juggled his monthly mortgage payments by breaking
them into two-week periods. Although he was in arrears on the
second and third mortgages, neither mortgagee had threatened
him with foreclosure.

In November, 1994, Dornemann, who previously had sought
out mortgages for sale from Lenders, Inc., of Massachusetts
(Lenders),[4] Mathias's second mortgagee, examined Lenders's
file on Mathias. At that time, the outstanding balance on the
second mortgage was nearly $15,000, and the amount in arrears
was over $1,600. Dornemann purchased the mortgage. His deci-
sion to do so was based upon the fact that Mathias "fit the
profile" of a candidate attractive to him. Although the evidence
does not expressly disclose the contents of Lenders's file,
Dornemann testified that the most important reason for his
selection of Mathias's mortgage was Mathias's payment history,
the market value of the property (about $74,000), the equity in
the property, and his understanding that foreclosure by Lenders
was "imminent."

Mathias first learned that Dornemann had purchased his
second mortgage in early December, 1994, when Lenders
returned his payment and informed him of the change of
mortgagees. About a week later, Dornemann called Mathias and
arranged a meeting to discuss the possibility of foreclosure on

[3]Dornemann testified that it was actually the seller who was "distressed"
and not the property.

[4]The name of this entity appears in several different forms in the record
before us. We adopt the version used by the judge in his findings of fact.

the mortgage and proposals by which Mathias could salvage his credit and property. They met at Mathias's home on December 17. Dornemann presented Mathias with a written notice of acceleration that contained a demand for past due payments and late charges, $2,036.77, within ten days. Mathias testified that he told Dornemann that there was no way possible for him to "come up with that type of money in that short [a] time."[5] The notice also provided that failure to pay the past due amount would cause the entire unpaid balance, $17,369.57, to be due immediately and that failure to pay that amount would trigger foreclosure and a public auction.[6]

Three days after the meeting, Dornemann sent Mathias a letter in which he again warned that if he did not receive the past due amount owed within seven days of the date of the letter, December 20, he would foreclose on the mortgage. Dornemann went on in this letter to offer Mathias a plan by which Mathias could prevent foreclosure: "We can offer you a Plan (let's call it Plan 1) which stops the foreclosure procedure and lends you money to cover all currently past due payments while you sell your home at a price that is fully acceptable to you." Dornemann characterized his plan as a "Purchase and Sell Back Agreement" in that it required Mathias to deed his home to Dornemann for one year, during which time Mathias would attempt to sell the property while also making monthly payments of $1,020.34. Dornemann would use Mathias's monthly payments to make payments on the three mortgages, insurance, and taxes. Once Mathias found a buyer for the property, Dornemann would sell it back to Mathias who, in turn, would pay Dornemann the money Dornemann lent Mathias to cover the current past due amount on the second mortgage, plus a service fee equal to one-half that current past due amount.

According to Mathias's testimony, he had no intention of selling his home before he met Dornemann. Nonetheless, Mathias engaged in further conversations with Dornemann

---

[5] It appears that at this meeting Mathias did make some payment, $345.10, to Dornemann.

[6] Threatening the homeowner with foreclosure was a technique recommended by NPA in order to "hold" the homeowner's attention during negotiations.

which led him to enter into three agreements with him, all dated January 28, 1995: a purchase and sale agreement, a quitclaim deed conveying the property to Dornemann, and an agreement for sale of real estate. The three documents consist of eleven single-spaced, typewritten pages.

The purchase and sale agreement set the purchase price for the property at $62,516, that is, the amount of the balance due on the outstanding mortgages. The agreement for sale of real estate provided that if Dornemann had not sold the property within one year, Mathias would buy it back for $67,516. The agreement also required Mathias, as of February 17, 1995, to make monthly payments to Dornemann in the amount of $1,024.34.[7] In turn, Dornemann would forebear from foreclosure. Any failure by Mathias to make the required monthly payments would result in an acceleration of the total amount due and trigger Dornemann's right to take possession of the property and sell it of his own accord.

Twice, at their first meeting in December and at the time of the signing of the documents on January 28, Mathias told Dornemann that he could not afford the monthly payment required by Dornemann's plan, which exceeded the total amount of the three mortgage payments he was already attempting to meet by juggling biweekly payments. Mathias testified that because he could not afford a lawyer, he was without legal advice throughout his dealings with Dornemann; that although he read the documents, he did not understand them; and that Dornemann explained the documents to him and assured him that they were a mere "formality." Mathias explained that because Dornemann assured him that the documents were a mere "formality" of the plan to save his property and because he wanted to stave off foreclosure and salvage what little credit he had, he signed the documents.

When, on February 17, Mathias failed to make the first payment due under the agreement, Dornemann sent him an eviction notice, dated February 24, in which he advised Mathias that he was to vacate the premises on or before March 24, as he

[7]The monthly amount of $1,024.34 was based upon Mathias's monthly payments due on each mortgage, one-twelfth of his property tax and insurance premium, and a monthly administrative fee of $15 to Argo.

intended to sell the property "as quickly as possible" and pay off Mathias's mortgages. In the notice, Dornemann reassured Mathias: "This situation is not as bad as it may seem. My objective is to use my own real estate agent to sell [the property] as quickly as possible. Once I have sold this property, I will immediately pay off all mortgages held in your name. When this happens[,] you will again have a clean credit record and should be able to successfully apply for new mortgages, loans, etc." Mathias moved out of his home in April, and Dornemann made payments to the first and third mortgagees through May.

In the meantime, on March 2, 1995, Dornemann entered into an "exclusive listing agreement" with a real estate broker in which the asking selling price was $80,000. At one point, Dornemann received an offer of $67,000 for the property. He never informed Mathias of the offer and, instead, made a counteroffer of $72,000. In any event and for whatever reason, the property was not sold, and Dornemann gave Mathias written notice, dated June 12, 1995, that he was canceling their purchase and sale agreement and reconveying the property to Mathias for the cited reason that Mathias had failed to disclose past due property taxes.[8]

On August 4, 1995, the first mortgagee, Bristol County Savings Bank (Bristol), after receiving notice of Mathias's transfer of the property to Dornemann, accelerated Mathias's mortgage and demanded an immediate payment of $40,745.09, plus interest and costs.[9] Mathias filed for bankruptcy on September 11, 1995. There the matter apparently stood until June 19, 1996. On

---

[8]The purchase and sale agreement provides: "[Dornemann] shall have the unilateral right to cancel this agreement . . . if the total current balance of liens against the Premises exceeds [Mathias's] representation of the same . . . or if [Mathias's] title is deemed unmarketable in [Dornemann's] sole opinion. In any case, if [Dornemann] cancels this Agreement, [Dornemann] shall promptly reconvey the Premises to [Mathias] by Release Deed."

[9]The agreement for sale of real estate between Dornemann and Mathias contains over twenty-seven paragraphs. Paragraph four lists the three mortgages on the property and goes on to provide: "The parties hereby acknowledge that they are aware of the fact that the mortgage(s) and/or encumbrances set forth in this Paragraph 4 are, or may be, subject to conditions which shall permit the oblige[e] thereof (the 'lender') upon the sale, transfer or assignment of the Premises, or any interest therein, by Seller, to: (a) Accelerate the payment of the obligation so that the entire amount of principal and interest is immediately due and payable."

that date, Mathias made a specific and detailed written demand for relief upon Dornemann pursuant to G. L. c. 93A. When Dornemann failed to make any offer of settlement, Mathias, on September 5, 1996, brought this action. In the meantime, Bristol had purchased the property at an August foreclosure sale for $48,900, which it then sold in November for $40,000.[10]

2. *The complaint.* There are six counts to the complaint before us, each of which recites that it is based upon common law or a specific statutory basis as well as G. L. c. 93A. There was also a demand for a jury trial. Our concern is confined to the first and second counts.[11] As to these counts the jury returned special verdicts, finding Dornemann liable for fraud and misrepresentation, breach of contract, and a wilful and knowing commission of an unfair act. The judge declined to accept the special verdicts, decided the matter for himself, and ordered judgment for Dornemann.

3. *The special verdicts.* Where the same facts are relied upon as the basis for a claim founded upon common law as well as an accompanying "parallel count under G. L. c. 93A," *Acushnet Fed. Credit Union* v. *Roderick*, 26 Mass. App. Ct. 604, 606 (1988), a trial judge has the "choice of letting the jury find the facts for both claims, reserving to himself all aspects of the c. 93A claim, or asking the jury for a non-binding advisory as to whether [the defendant] had acted unfairly or deceptively." *Ibid.* See *International Totalizing Sys., Inc.* v. *PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 435-436 (1990).

There is, however, cause for concern about the use of an advisory jury when a claim is based exclusively upon G. L. c. 93A. See *Augustine* v. *Rogers*, 47 Mass. App. Ct. 901, 903 (1999), citing *Nei* v. *Burley*, 388 Mass. 307, 315 (1983); *Delaney* v. *Chief of Police of Wareham*, 27 Mass. App. Ct. 398, 401

---

[10]The value of the property apparently had depreciated because of new septic system regulations, effective as of June, 1996.

[11]More particularly, Mathias alleged (1) fraud in the inducement; (2) breach of contract; (3) violation of the so-called "Truth-in-Lending" law; (4) violation of the so-called "Real Estate Settlement Procedures Act"; (5) misrepresentation; and (6) conveyance of realty without appropriate inspection and certification of its septic system. The judge directed verdicts in Dornemann's favor on the third, fourth, fifth, and sixth counts of the complaint. Mathias makes no argument concerning the directed verdicts.

(1989); Mass.R.Civ.P. 39(c), 365 Mass. 802 (1974). As observed in *Augustine, supra,* the concern is as follows. Because "there is no right to a trial by jury for actions cognizable under G. L. c. 93A," *Nei* v. *Burley,* 388 Mass. at 315, the authorization for special verdicts is found in rule 39(c), which reads, "[i]n all actions not triable of right by a jury, the court, except where otherwise provided by law, may upon motion frame issues of fact to be tried by a jury." Special verdicts returned pursuant to rule 39(c) are binding. See *Delaney* v. *Chief of Police of Wareham,* 27 Mass. App. Ct. at 401-402, and authorities therein cited.

Relying upon *Delaney,* Mathias argues that the special verdicts returned on the two counts of the complaint before us (see note 11, *supra*) were binding on the judge and must be reinstated. This argument overlooks the fact that although the record in *Delaney* was "extremely unclear on the jury's role in the case," the court nonetheless concluded that the parties' failure to object bound them to the trial judge's procedure. 27 Mass. App. Ct. at 401-402. In the present case, the judge made it quite clear on several occasions that the jury's verdicts were to be advisory and not binding. Mathias gave no indication that he did not understand or that he objected to the judge's ruling.[12]

---

[12]At a bench conference during jury impanelment, the judge gave notice of his reading of the complaint and the manner in which he proposed to conduct the trial. He stated:

> "Since this is a 93A action, we're going to try this case as follows: I'm going to try this case to the jury. I'm going to send all issues to the jury. I'm going to — their decision is going to be advisory only. I will reserve to myself the right to either accept what they do, reject what they do, or alter what they do. Everybody understand that?"

Counsel for the parties stated that they understood and neither objected.

Next, the judge gave preliminary instructions to the jury. He informed them that Mathias was alleging a violation of c. 93A, a statute that "prohibits the use of unfair or deceptive acts or practices in the course of certain kinds of dealing," and that they were "going to have to determine . . . whether or not there was an unfair or deceptive act or practice committed." Again, neither party lodged an objection.

No objection was taken to the formulation of the special questions put to the jury, to which they responded that (1) Dornemann knowingly made a false representation of fact to Mathias, intending to induce him to act or refrain from acting in reliance on the false statement; (2) Mathias, to his damage,

Whether we deem the claim waived, *Delaney, supra,* or apply the doctrine of law of the trial, see *Dalton* v. *Post Publishing Co.,* 328 Mass. 595, 599 (1952), our conclusion is the same. The jury's special verdicts were not binding on the judge.[13]

4. *The judge's decision.* "In reviewing a matter in which the trial judge acts as fact finder, we 'accept the judge's findings of fact as true unless they are clearly erroneous' . . . [and] we 'scrutinize without deference the legal standard which the judge applied to the facts.' " *Mayer* v. *Cohen-Miles Ins. Agency, Inc.,* 48 Mass. App. Ct. 435, 438 (2000), quoting from *Kendall* v. *Selvaggio,* 413 Mass. 619, 620, 621 (1992). As we read the judge's decision, his determination that Dornemann was entitled to judgment was based more upon conclusions of law rather than upon his findings of fact. Although we see no error in the judge's conclusion in respect to Mathias's claim of a c. 93A violation by reason of a breach of contract,[14] the same cannot be

justifiably relied on Dornemann's false statement; (3) Dornemann did breach his contract with Mathias; (4) Dornemann knowingly and wilfully committed an unfair or deceptive act or practice that caused Mathias to suffer damages in the amount of $26,166.

Nor did Mathias take objection to the judge's instruction to the jury that they could not find liability under c. 93A without first finding either that Dornemann was in breach of his contract with Mathias or that Mathias had relied upon a false representation made by Dornemann. When the jury returned with their answers, Dornemann sought affirmation of his understanding of the effect of the special verdicts: "It's my understanding . . . that this is an advisory jury verdict only on the Chapter 93A . . . which is the only count that is in this case . . . ." When the judge responded "yes," Mathias remained silent.

[13]We reach this conclusion notwithstanding that in *Delaney, supra,* the court chose to put aside the jury's special verdicts for purposes of analyzing the sufficiency of the evidence. It did so on the basis that the trial judge refused to accept the jury's special verdicts for the reason that the evidence was, as matter of law, insufficient to support their responses. The record in the present case allows no doubt. Dornemann asked and argued for a directed verdict on the basis of the insufficiency of the evidence. After hearing argument, the judge denied the motion and decided the matter on the basis of the evidence presented to him.

[14]As for the breach of contract count, the judge stated that he had erroneously instructed the jury that this claim was based solely upon the purchase and sale agreement. We agree that the instruction was wrong. See *Chelsea Indus., Inc.* v. *Florence,* 358 Mass. 50, 55 (1970); *Chase Commercial Corp.* v. *Owen,* 32 Mass. App. Ct. 248, 250-251 (1992). Based upon the terms of that agreement *and* the agreement for sale of real estate, the judge concluded that Dornemann never assumed Mathias's mortgages but, instead, took title

said of his reasoning on Mathias's allegations that Dornemann fraudulently induced him to enter into the agreements in issue.

As noted at the outset, the judge construed Mathias's complaint as being brought solely under c. 93A, and he conducted the trial accordingly. See note 12, *supra.* However, in rejecting Mathias's claim of fraud in the inducement, the judge confined himself to the question whether Dornemann made any statements inconsistent with the written documents, and he gave no consideration to the circumstances surrounding their execution. In short, his analysis was predicated solely upon common law. He found and concluded that Dornemann never said that he would assume Mathias's mortgage liability and that Dornemann did not make any misrepresentation in respect to his service fee. The judge also concluded that even had Dornemann misrepresented any facts, Mathias was precluding from relying upon any such statements because of the "merger" clause set out in the purchase and sale agreement.[15] Moreover, the judge also ruled that Mathias was not entitled to judgment because he failed to show that he suffered any actual damages.[16]

Dornemann cannot take shelter from liability on the claim of fraud in the inducement under the "merger" clause. "Whether we refer to the clause . . . as a merger clause, an integration clause, or an exculpatory clause, the settled rule of law is that a contracting party cannot rely upon such a clause as protection against claims based upon fraud or deceit." *Sound Techniques, Inc.* v. *Hoffman,* 50 Mass. App. Ct. 425, 429 (2000), citing *Bates* v. *Southgate,* 308 Mass. 170, 182-183 (1941). See *McEvoy Travel Bureau, Inc.* v. *Norton Co.,* 408 Mass. 704, 712-713 (1990). Further, any failure to show actual damages would

---

"subject" to them. When Mathias did not make the payments due under the agreement for sale of real estate, he failed to substantially perform his part of that agreement. Consequently, Dornemann was entitled to evict him from the premises without being in breach of the terms of the agreements.

[15]That clause reads: "The parties acknowledge that this Agreement has been entered into by them in full reliance on their own investigation and, except as set forth herein, not on any statements, representations or other agreements made by or with the other party."

[16]The judge relied upon the so-called "benefit of the bargain" rule and concluded that because Mathias could not show that he had any equity in the property, he could not show that he had suffered any damages by reason of Dornemann's acts.

not preclude an award of nominal damages and counsel fees. See *Leardi* v. *Brown*, 394 Mass. 151, 160 (1985) ("under circumstances where there has been an invasion of a legally protected interest, but no harm for which actual damages can be awarded, we conclude that [c. 93A, § 9(3),] provides for the recovery of minimum damages in the amount of $25").

Based upon the judge's decision and the record before us, the only remaining question is whether the judge's erroneous analysis of Mathias's allegations of fraud in the inducement requires reversal and remand for purposes of consideration of the evidence in accordance with the purpose and intent of c. 93A. Put another way, we must consider whether a trial judge could reach a different conclusion were he to consider the claim of fraud in the inducement in light of the scope, intent, and purpose of c. 93A rather than confining himself to an analysis controlled by common-law elements of deceit.

5. *Discussion.* Because Dornemann's business facade was such that he was neither a lender nor a mortgage broker, he put his actions outside the express language of any statutory or regulatory prohibitions that might otherwise control. See G. L. c. 140D; G. L. c. 255E; 940 Code Mass. Regs. §§ 8.00 et seq. (1992). However, whether an act or practice violates a statute or rule promulgated under G. L. c. 93A, § 2, is but one of several factors to be applied to all the circumstances of the transaction (see *Schubach* v. *Household Fin. Corp.*, 375 Mass. 133, 137 [1978]; *Martin* v. *Factory Mut. Research Corp.*, 401 Mass. 621, 623 [1988]) in determining whether it is unfair or deceptive. See *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 595-596 (1975), accepting the standards developed by the Federal Trade Commission pursuant to 29 Fed. Reg. 8325, 8355 (1964), as approved in *Federal Trade Commn.* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972).[17] See also *Swanson* v. *Bankers Life Co.*, 389 Mass. 345, 349 (1983)

---

[17]As set out in 29 Fed. Reg. 8325, 8355 (1964), as accepted in *Sperry & Hutchinson, supra* at 244 n.5, and as applied in *PMP Assocs.*, the factors that control a determination of whether an act is unfair or deceptive are "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . ."

("In determining whether an act or practice is unfair, as opposed to deceptive, we must evaluate the equities between the parties. . . . What a defendant knew or should have known may be relevant in determining unfairness . . . . Similarly, a plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair").

There is a resemblance between the circumstances of the transaction in the instant case and those presented in *Hogan* v. *Riemer*, 35 Mass. App. Ct. 360 (1993).[18] There the plaintiff sought damages from a second mortgagee on the basis of alleged violations of G. L. c. 93A. She claimed that the defendant induced her into a loan agreement, the actual terms of which were far more burdensome than as originally described to her, with the assurances that, " 'We'll work with you,' [and] 'We don't want to own your house.' " *Id.* at 367.

As established on cross motions for summary judgment in *Hogan*, the undisputed facts were as follows. Because the plaintiff was in the process of a divorce and wished to purchase her husband's interest in the marital residence, she was in need of a loan. She apparently sought assistance from a mortgage broker and was, in turn, referred to the defendant. *Id.* at 366 n.6. She made no complaint against the mortgage broker, and confined her allegations to the defendant.

Both the plaintiff's loan application and the required disclosure statements established that the monthly payment on the loan would exceed her average monthly income. However, the plaintiff explained to the defendant that she could meet the monthly payment once her business, an airport flower shop, improved and that she anticipated such an improvement within six months. On that basis, she requested that she be given a six-month grace period on the first payment of the loan. The defendant approved the loan and gave her the requested grace period. The plaintiff was represented by counsel "[t]hroughout the closing." *Id.* at 362.

About one month before the expiration of the grace period, the defendant gave the plaintiff a written reminder of the due

---

[18]Riemer was doing business as Pickwick Financial Associates. *Hogan, supra* at 360 n.1.

date of her first payment. Because the plaintiff's business did not meet her expectations during the grace period, she failed to make the first required payment. Sixteen days after the due date for the payment, the defendant declared the entire note due and payable and commenced foreclosure proceedings.

In affirming the grant of summary judgment in the defendant's favor, the majority of the court concluded that the undisputed facts established that the plaintiff could show neither the essential elements necessary to sustain an action for misrepresentation nor circumstances sufficient to support a claim of an unfair or deceptive act. *Id.* at 365-368.

Although accepting the majority's reasoning in respect to the common-law elements of fraud and misrepresentation, the dissent expressed the view that it was wrong to grant summary judgment in favor of the defendant in respect to the claimed violation of c. 93A. Relying upon the principle that the question of unfairness is essentially a factual question, the dissent concluded that on all the facts, disputed as well as undisputed, the plaintiff was entitled to a trial on her c. 93A claim. *Id.* at 369-371.

In our view, the circumstances presented in the instant case are far more extreme than those discussed in the majority and dissenting opinions in *Hogan, supra.* We capsulize rather than repeat the evidence recited in detail in part one of this opinion, *supra.* There was a significant disparity between the parties as to their education and level of sophistication in business matters. Mathias did not initiate contact with Dornemann. Rather, based upon the data contained in Lenders's file, Dornemann targeted Mathias as a "distressed" seller, see note 3, *supra,* sought him out, and took control of his property by following NPA's recommended procedures, procedures intended to enable "acquisition of real estate at prices far below 'Fair Market Value.' " See note 2, *supra.*

Mathias, unrepresented by counsel due to financial constraints, read but did not understand the agreements. He told Dornemann, at least twice, that the amount of the monthly payments under the plan was more than the monthly amount he was currently unable to pay. Notwithstanding Mathias's expressed concerns and the information gleaned from scrutiny of Lenders's

file, Dornemann represented that the agreements were a mere formality. Within one month of the date of the agreements and seven days after Mathias failed to meet the first payment due Argo, Dornemann set in process his rights under the agreements: he accelerated the mortgage, evicted Mathias, and, unable to sell the property for the amount he had anticipated, reconveyed the premises to Mathias.

Because the trial judge erroneously failed to consider the evidence of all the relevant circumstances of the transaction, the matter must be remanded to the Superior Court for further proceedings. Should the Superior Court judge find and conclude, after consideration of the evidence of all the circumstances of the transaction, that Dornemann's actions were unfair, deceptive, and in violation of c. 93A, the judge is then to consider the amount of damages due Mathias and whether the actions were wilful and knowing, keeping in mind Dornemann's response to Mathias's written demand for relief.

6. *Conclusion.* The judgment is reversed, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion. Although Mathias did not prevail at trial, he is entitled to an award of appellate attorney's fees, see *Leardi* v. *Brown*, 394 Mass. at 168, the amount of which shall be established in accordance with the procedures detailed in *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 20 (1989).

*So ordered.*