Gants, Ralph D., J.
The defendant Fremont Investment & Loan (“Fremont” or the “Bank”) is a California state-chartered industrial bank that, between January 2004 and March 2007, originated 14,578 loans to Massachusetts residents secured by mortgages on owner-occupied homes. Of those loans, only roughly 3,000 remain active; roughly 2,500 continue to be serviced by Fremont. Most of these loans were made in what has become known as the “sub-prime” market, in which customers who generally would not have qualified for traditional prime mortgages were provided loans at higher rates of interest. Not surprisingly, in these times, a significant number of these loans are in default and Fremont seeks to foreclose on some of them. On October 4, 2007, the Commonwealth of Massachusetts, acting through the Massachusetts Attorney General, filed the instant complaint alleging that Fremont, in its past lending practices in the sub-prime market, has engaged in unfair and deceptive acts or practices in violation of G.L.c. 93A, §2. The Attorney General now moves for a preliminary injunction that would bar Fremont, during the pendency of this action, from initiating or advancing any foreclosure on any residential mortgage loan in Massachusetts without the written consent of the Attorney General’s Office.
BACKGROUND
On March 7, 2007, after having being advised of charges of unsound banking practices brought against it by the Federal Deposit Insurance Corporation (“FDIC”), Fremont, without admitting the alleged charges, entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist (“Consent Agreement”). Under the Consent Agreement, Fremont was ordered to cease and desist from, inter alia:
(b) “operating the Bank without effective risk management policies and procedures in place in relation to the Bank’s primary line of business of brokered subprime mortgage lending”;
(d) “operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by the Bank”;
(f) “operating with a large volume of poor quality loans”;
(g) “engaging in unsatisfactory lending practices”;
(l) “marketing and extending adjustable-rate mortgage (“ARM”) products to subprime borrowers in an unsafe and unsound manner that greatly increases the risk that borrowers will default on the loans or otherwise cause losses to the Bank, including ARM products with one or more of the following characteristics:
(i) qualifying borrowers for loans with low initial payments on an introductoiy or “start” rate that will expire after an initial period, without an adequate analysis of the borrower’s ability to repay the debt at the fully-indexed rate;
(ii) approving borrowers without considering appropriate documentation and/or verification of their income;
(iii) containing product features likely to require frequent refinancing to maintain an affordable monthly payment and/or to avoid foreclosure;
(iv) including substantial prepayment penalties and/or prepayment penalties that extend beyond the initial interest rate adjustment period;
(v) providing borrowers with inadequate and/or confusing information relative to product choices, material loan terms and product risks, prepayment penalties, and the borrower’s obligations for properly taxes and insurance;
(vi) approving borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers’ ability to meet their overall level indebtedness and common housing expenses; and/or
(vii) approving loans or ‘piggyback’ loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the value of the collateral"; and
(m) making mortgage loans without adequately considering the borrower’s ability to repay the mortgage according to its terms.
Consent Agreement at 2-4.[1]
*569 On or about July 10, 2007, Fremont and the Massachusetts Attorney General entered into a Term Sheet letter agreement (“Term Sheet”) that set forth a procedure that Fremont agreed to follow before foreclosing on any of the Massachusetts residential mortgage loans it continued to own or service. In a nutshell, under the Term Sheet, Fremont agreed to provide the Attorney General with the Loan Documentation regarding a troubled loan at least 90 days before commencing any foreclosure proceeding.[2] During that 90-day period, the Attorney General could object to the foreclosure, and state her reasons for doing so. If there were an objection, Fremont agreed not to proceed with the foreclosure and instead to negotiate in good faith to resolve the Attorney General’s objection, perhaps by agreeing to revise the terms of the loan or arranging for replacement financing. If no resolution could be reached, Fremont was free to proceed with foreclosure, but only after giving the Attorney General fifteen days advance notice, which allowed her time to determine whether she would seek to enjoin the foreclosure.
Pursuant to this Term Sheet agreement, Fremont sent the Attorney General the Loan Documentation for 119 loans subject to a 90-day review. On October 4, 2007, the Chief of the Consumer Protection Division of the Attorney General’s Office wrote that the Attorney General objected to foreclosure as to all of them. Fremont had also sent the Attorney General the documentation for another 74 loans which it wished to foreclose upon, subject to an expedited 45-day review. As to each of the 74 loans, Fremont represented that the homes to be foreclosed upon were not owner-occupied and that Fremont had been unable to contact the borrower, despite repeated attempts to do so. As to these 74 loans, also on October 4, the Attorney General objected to foreclosure as to only one. In short, on October 4, 2007, the Attorney General objected to every foreclosure proposed by Fremont except as to those loans where the home was not owner-occupied and Fremont had been unable to contact the borrower. That same day, it filed the complaint in the instant action.
The Term Sheet agreement was terminable at will by either party. On December 10, 2007, Fremont exercised its right to terminate in a letter to the Attorney General, writing that “it is now apparent that the Attorney General has ho intention of engaging in a meaningful review process on a borrower-by-borrower basis, but rather is seeking wholesale discontinuance of all foreclosure referrals and sales.” In that same letter of termination, Fremont stated that it was committed to continue to attempt loan modifications and other means of “workout” to avoid foreclosure, and would continue to provide the Attorney General with a loan file prior to referring the loan for foreclosure.
With the Term Sheet agreement no longer in force, the Attorney General asks this Court to enjoin Fremont from initiating or advancing any foreclosure without the Attorney General’s written consent. Alternatively, she proposes a more limited preliminary injunction in which Fremont would be enjoined from initiating or advancing any foreclosure of what she characterizes as “Presumptively Unfair Loans,” which she defines as ARMs with a low introductory rate of three years or less in which either (a) the combined loan-to-value ratio was 90 percent or higher, (b) the loan was approved on a “stated income” basis, meaning that Fremont essentially accepted the borrower’s statement of income without requiring verification, or (c) the loan had a prepayment penalty. However, the Attorney General offered one exception to the prohibition on foreclosure of Presumptively Unfair Loans— Fremont could proceed with the foreclosure if it could demonstrate the presence of one of three Mitigating Factors: (1) the borrower consented in writing to the foreclosure, (2) the property was vacant and uninhabitable, or (3) the property was a vacant investment property. The Attorney General would have 45 days to verify the existence of the Mitigating Factor and determine whether to dispute it. If she did dispute it, Fremont would need the approval of the Court to proceed with the foreclosure. As to loans that were not Presumptively Unfair, under the alternative proposed by the Attorney General, Fremont would be required, as under the Term Sheet agreement, to provide the Attorney General with loan documentation at least 90 days prior to initiating the foreclosure and, if she objected to the foreclosure, Fremont would need court approval before proceeding with the foreclosure.
FINDINGS OF FACT
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law." Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). In otherwords, in finding the facts on a motion for preliminary injunction, this Court must “play the cards it is dealt,” which may be a far more modest deck than it may be dealt at trial, after discovery has been completed. Consequently, the preliminary findings of fact beulow are based on the affidavits and attached exhibits furnished by the parties, as well as reasonable inferences from that evidence.
During the relevant time period in question — January 2004 to March 2007, when Fremont stopped originating residential mortgage loans — Fremont was a substantial lender in the sub-prime mortgage market. It is difficult to ascertain from this record what percentage of Fremont’s residential loans could fairly be characterized as sub-prime loans, but this Court estimates that it was between 50-60 percent.[3] In all (or virtually all) of these loans, Fremont did not interact directly with the borrower. Rather, these loans were brought to Fremont by mortgage brokers who were independent contractors, compensated through a broker’s fee that was paid upon the closing of the *570 loan. Typically, the broker would contact one of Fremont’s account executives to request a certain loan product and provide the borrower’s credit report and loan application. The account executive would determine if the prospective borrower was “prequalified” and, if so, send the broker a non-binding interest rate quote on the requested loan product, and set forth the conditions the borrower needed to meet to obtain the loan. Once the borrower had agreed to proceed with the loan, the broker would send the account executive the documentation necessary to satisfy the pre-qualification conditions, generally the appraisal of the property, the required disclosures, and documentation regarding employment and income. All of this information was then sent to an account manager at one of Fremont’s operation centers, where it would be examined by the underwriting department for final approval. If approved, the loan would proceed to closing, with the Bank retaining an attorney to protect its interests at the closing.
As noted, 38.4 percent of these loans were “stated-income” loans in which the borrower was permitted to state his income without having to provide the usual verifying documentation, such as income tax returns, W-2s, or pay stubs. For these loans, the only “underwriting” that Fremont did regarding the income stated was to compare the salary stated with the salary typical for such an occupation in that geographic area, using data obtained from salaiy.com. These loans were, in theory, designed for those borrowers who could not verify their income with income tax returns or who had unreported income, but the extraordinarily high percentage of these loans — 38.4 percent— strongly suggests that they were not limited to these rather unusual circumstances. Since there was a substantially greater risk that the borrower had inflated his income with “stated-income” loans, the borrower paid a higher interest rate than for documented loans.
The very essence of a sub-prime mortgage loan is that the bank is lending money to a borrower who poses a greater-than-average-credit risk, and demands a higher rate of interest in return for that increased risk. In order to reduce the interest rate, virtually all Fremont sub-prime mortgages were ARMs, with a low introductory rate (pejoratively referred to as a “teaser rate") which would continue generally for two or three years, at which time the loan would be adjusted to a variable rate based on a market rate of interest — the 6-month London Interbank Offered Rate (“LIBOR”), plus an additional percentage to reflect the high risk of the loan (known as the “rate add,” e.g. LIBOR plus 5). The introductory rate would be considerably lower than the adjusted rate, so the amount of mortgage interest would substantially increase once the adjusted rate kicked in even if the LIBOR had not changed or had even fallen (known as “payment shock”). Most ARMs limit the extent of the payment shock by limiting the percentage increase that may occur during each period of adjustment, so the adjustable interest rate would increase with each adjustment until it would reach the LIBOR plus the rate add (but not exceed the maximum interest rate cap). Most of the ARMs that Fremont provided were 2/28 or 3/27, meaning they were 30 year loans where the introductory rate remained for two or three years, with adjustments every six months after the introductory period. The lower the introductory rate and the lower the limits on the interest rate increase that may occur upon each adjustment, the longer it would take for the actual interest rate to reach the LIBOR plus the rate add. Once it reached that level, the interest rate would increase or decrease based on changes in the market rate of interest.
In determining whether a borrower qualified for the loan, Fremont’s underwriting department generally looked at the debt-to-income ratio, that is, the ratio between the borrower’s monthly debt payments (including the applied-for mortgage) and his monthly income. While there were exceptions, generally the borrower needed to have a debt-to-income ratio less than or equal to 50 (sometimes 55) percent in order to qualify.[4] In calculating the prospective borrower’s monthly debt payments, Fremont’s underwriters used the monthly mortgage payments for the introductory period, not the monthly mortgage payment that would be due under the “fully indexed rate,” that is, the LIBOR at the time of the inception of the loan plus the rate add. As a result, many marginal credit risks qualified for ARMs based solely on the low introductory rate, but would not have qualified using the fully indexed rate.[5]
Even relying on the low introductory rate to determine the debt-to-income ratio, there were still interested borrowers who did not qualify. For these borrowers, Fremont offered what it called an extended amortization option, which was essentially a 40-year note, with monthly payments reduced from the 30-year note because they were spread out over the 40-year period, with a balloon payment due at the end of 30 years (since the loan would not be fully amortized by that time). 12.2 percent of all Fremont’s originated loans contained this extended amortization option with a balloon payment after 30 years.
Not surprisingly, the poor credit risks who were the target audience for sub-prime mortgage loans also often had little or no savings, so Fremont offered borrowers mortgage loans that required little or no down-payment, referred to in the lending industry as loans with a loan-to-value ratio equal to or approaching 100 percent. While some first mortgages provided 100 percent financing, most 100 percent financing was accomplished with a first mortgage providing 80 percent financing and a second mortgage providing the remaining 20 percent financing, referred to in the industry as “piggy-back loans.”
*571 The benefit to consumers from sub-prime mortgages was that they were eligible to obtain mortgages they would not otherwise have been eligible to obtain, albeit at higher rates of interest, and thereby could purchase homes they would not otherwise have been able to purchase. Consumers obtaining sub-prime mortgages shared the same risks that every person faced who stretched themselves financially to purchase their home — the usual danger of being unable to meet the mortgage payments because of a future reduction in income from the loss of a job or a sudden increase in other expenses, perhaps resulting from an illness in the family. These risks were greatest for those borrowers with the highest debt-to-income ratios and the fewest assets, since they had no cushion to deal with financial adversity. Some of these consumers, however, faced an especially grave risk— those with 2/28 or 3/27 ARMs with low introductoiy rates, who qualified for a mortgage only based on those low introductoiy rates and would not have otherwise qualified if the fixed index rate had been used by Fremont’s underwriting department to determine eligibility. As to these loan customers, when the payment shock set in, their debt would exceed 50% of their income, sometimes by a considerable amount, and they foreseeably could no longer afford to pay the mortgage. These customers, often relying on the advice of their mortgage broker, generally understood that they would need to refinance the loan at or before the date the introductoiy rate ended so that they could continue to pay the low monthly payments provided by the so-called teaser rate and avoid the payment shock that would force them into foreclosure. However, what these customers often did not understand was that, if they had purchased a 100 percent financing mortgage, whether through a single loan or piggyback loans, they would only be eligible for refinancing if the fair market value of their property increased during those two or three years of the introductoiy rate because, if it fell, they would not be able to refinance their home for more than it was worth. For these borrowers, unless their income considerably increased, they would be doomed to default and foreclosure if the housing market fell (as, of course, it did).
Consequently, it is hardly surprising that when the Attorney General looked carefully at the Loan Documentation that Fremont provided on August 30, 2007 regarding 98 loans that it proposed to foreclose it found that:
All 98 were ARMs. 93 had two-year introductory rates, while four had a three-year rate.
All would produce payment shock when the intro-ductoiy rate period concluded. The introductoiy rate on these loans varied from 6.1 percent to 12.4 percent. The payment shock increase could increase the interest rate 3 percent, with the potential of another 1.5 percent interest hike eveiy six months.
90 percent of the 98 had a 100 percent loan-to-value ratio.[6]
14 of the 98 loans had a prepayment penalty, in which the borrower was required to pay up to six months worth of interest if he paid off the note (through sale or refinancing) before a designated period. For 13 of these 14, the prepayment penalties applied only during the introductoiy period;[7] for one, it extended through the first year of the payment shock period. Consequently, for these borrowers who were eligible for the loan only because the teaser rate was used to calculate the debt-income ratio, the timing of refinancing was critical — they could not afford to pay the mortgage after payment shock set in but they would pay a substantial prepayment penalty if they refinanced during the introductory period. Consequently, these borrowers had little real discretion as to when to refinance; for all practical purposes, it was essential that they close on the refinanced loan right when the introductoiy rate ended. If they were unable to refinance during this brief window, they would be unable to afford the mortgage payments, which would place them in default, which would increase the amount needed to refinance, which would make it even harder to qualify for the refinancing.
All of the dangers this Court has cited are present even if the loan application accurately states the borrower’s income. All of these dangers obviously are exacerbated if the loan application wrongly inflates the borrower’s income or assets, because then the debt-to-income ratio used by underwriting to determine whether the prospective borrower qualifies for the loan is based on an inflated income figure. It is too strong to say that “stated income” loans invite the borrower to commit such fraud, because the borrower is required to state his income on the loan application under the pains and penalties of peijuiy. However, it is fair to infer that “stated income” loans present a far greater risk of fraud than full documentation loans, because not only is the lender for these loans not requiring any documentation of the borrower’s income, expenses, or employment but the lender is also implicitly telling the borrower that it will not verify the borrower’s statements on the loan application by looking at these documents. Not surprisingly, 50 of the 98 loans in the Attorney General’s sample of loans targeted by Fremont for foreclosure were “stated income” loans.[8]
The preliminary injunction record reflects that, at least in a few of these mortgage loans, the loan application falsely described the borrower’s occupation and substantially inflated the borrower’s income. Specifically, the Attorney General submitted eight affidavits from lenders facing foreclosure. In six of these applications, the borrower’s stated income was substantially inflated on the loan application. In each of these six false loan applications, this Court finds that the mortgage broker either prepared the loan application *572 and inflated the income without the borrower’s knowledge or permission (even though each borrower signed the loan application under the pains and penalties of perjury) or acted in complicity with the borrower in misrepresenting the borrower’s income in order for the borrower to qualify for the loan. There is no evidence that Fremont knew of these misrepresentations. Nor is there any evidence that Fremont willfully blinded itself to the fact that some of the mortgage brokers who brought loans to it were knowingly inflating the borrower’s income. Nor does this Court find, based on this record, that Fremont recklessly supervised its brokers by continuing to do business with them after Fremont learned that the brokers had a pattern or practice of inflating the borrower’s income on the loan applications they had submitted. In short, with respect to the falsified loan applications, the evidence in the record reflects that Fremont was a victim of these misrepresentations and did not encourage or tolerate them.
Nor does this record reflect that Fremont made false representations to borrowers regarding the terms of their loan. From the few closing documents that are before the Court, there is no evidence that the terms were concealed or misrepresented in the closing documents. Nor is there any evidence that Fremont representatives made such misrepresentations. Indeed, apart from the closing attorney that Fremont retained, the borrowers who submitted affidavits did not appear to speak directly with any Fremont representative; they spoke only with their mortgage broker. To be sure, there is evidence that, in some of the loan transactions, the brokers had mischaracterized the loan terms and made vague promises of refinancing that they reneged upon when the time for refinancing arose, but there is no evidence that Fremont joined in making any of these misrepresentations or baseless promises or even knew of them. There is also evidence that at least some of the borrowers either did not read the closing documents or did not truly understand their terms, but this Court does not find Fremont responsible for that misunderstanding, especially since many of the loan documents are forms required under federal law.
The remaining question, then, for this Court is whether the Attorney General is likely to prevail in proving that certain of the sub-prime mortgage loans offered by Fremont were, as the Attorney General describes it, “structurally unfair,” whose issuance was an unfair act or practice in violation of G.L.c. 93A, §2. This Court will address that question in its Conclusions of Law.
CONCLUSIONS OF LAW
G.L.c. 93A, §2(a) makes unlawful any “(u)nfair or deceptive acts or practices in the conduct of any trade or commerce.” G.L.c. 93A, §2(a). The Supreme Judicial Court has stated “that the following are ‘considerations to be used in determining whether a practice is to be deemed unfair: (1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).’ ” Datacomm Interface, Inc. v. Compulerworld, Inc., 396 Mass. 760, 778 (1986), quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed. Reg. 8325, 8355 (1964). An act or practice that is deceptive or fraudulent may be found to be unfair, but an act or practice need not be deceptive or fraudulent to be unfair. See Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc., 403 Mass. 722, 729 (1989). An act may be unfair even if it does not violate a statute, or a regulation issued under G.L.c. 93A, §2. See Schubach v. Household Finance Corp., 375 Mass. 133, 137 (1978) (“We reject the argument that an act or practice which is authorized by statute can never be an unfair or deceptive act or practice under §2(a) of G.L.c. 93A”). “[W]hether an act or practice violates a statute or rule promulgated under G.L.c. 93A, §2, is but one of several factors to be applied to all the circumstances of the transaction ... in determining whether it is unfair or deceptive.” Billingham v. Dornemann, 55 Mass.App.Ct. 166, 176 (2002). Similarly, as the Supreme Judicial Court has made clear, an act may violate Chapter 93A without constituting a cause of action under any common law tort:
Chapter 93A is “a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.” Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). The relief available under c. 93A is “sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action.” Id. at 704. It “mak[es] conduct unlawful which was not unlawful under the common law or any prior statute.” Commonwealth v. DeCotis, 366 Mass. 234, 244 n.8 (1974). Thus, a cause of action under c. 93A is “not dependent on traditional tort or contract law concepts for its definition.” Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 626 (1978). See JVeio. Burley, 388 Mass. 307, 313 (1983) (“(A)nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims”).
Kattarv. Demoulas, 433 Mass. 1, 12-13 (2000).
Here, at the time that Fremont issued the mortgage loans at issue in this motion, there was no federal or Massachusetts statute or regulation applicable to all mortgage loans that expressly prohibited Fremont from issuing adjustable rate mortgage loans, loans with a loan-to-value ratio of 100 percent, “stated *573 income” loans, or loans with a prepayment penalty. Nor was there any federal or Massachusetts statute or regulation applicable to all mortgage loans that provided that a borrower could not qualify for a mortgage loan if his debt-to-income ratio exceeded 50 percent or some other percentage ceiling. Nor was there any federal or Massachusetts statute or regulation applicable to all mortgage loans that prohibited these practices from occurring together — that is, there was no federal or Massachusetts statute or regulation that expressly declared that a bank could not issue a 2/28 ARM, stated income loan with a Ioan-to-value ratio of 100 percent and a prepayment penalty for the early payoff of that loan (through sale or refinancing) to a borrower with a debt-to-income ratio exceeding 60 percent. Nor is there any indication from the record that it was unusual for sub-prime lenders to engage in any or all of these practices.
There were, however, Massachusetts statutes and regulations that prohibited many of these practices in “high cost mortgage loans,” defined as a loan secured by the borrower’s principal dwelling in which:
for a first mortgage, the interest rate exceeded by more than 8 percentage points the yield on United States Treasury securities having comparable maturity periods, or
the total points and fees were greater than 5 percent of the total loan or $400, excluding up to 2 “bona fide loan discount points” paid by the borrower to lower the benchmark rate of interest.
G.L.c. 183C, §2. The Predatory Home Loan Practices Act (“the Act”), enacted on August 9, 2004 and made effective on November 7, 2004, prohibited lenders from making a “high cost mortgage loan” “unless the lender reasonably believes at the time the loan is consummated that 1 or more of the obligors will be able to make the scheduled payments to repay the home loan based upon a consideration of the obligor’s current and expected income, current and expected obligations, employment status, and other financial resources other than the borrower’s equity in the dwelling which secures repayment of the loan.” G.L.c. 183C, §4. The Act provided lenders with a safe harbor in making a reasonable .determination regarding the borrower’s ability to repay — if the borrower’s debt-to-loan ratio was 50 percent or less, the borrower was presumed able to make the scheduled payments. Id. See also 209 CMR 32.34(c) (same). The Act also prohibited lenders from adding prepayment fees or penalties to high-cost mortgage loans. Id. at §5. A violation of the Act was deemed a violation of Chapter 93A. Id. at § 18(a).
The spirit of the Act is that a lender engages in predatory lending, which is an unfair act in violation of Chapter 93A, when it makes a loan charging either high points, fees, or interest to a borrower whom the lender reasonably believes will be unable to make the scheduled payments and will therefore face the likelihood of foreclosure. It is noteworthy that the issuance of such a loan is deemed to be unfair under Chapter 93A even if the lender provides fair and complete disclosure of the terms of the loan and the borrower is fully informed of the risks he faces in accepting the loan. The unfairness, therefore, does not rest in deception but in the equities between the parties. See Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983) (“In determining whether an act or practice is unfair, as opposed to deceptive, we must evaluate the equities between the parties”). The Legislature plainly deemed it predatory and, thus, unfair for a lender to make a high-cost home loan, quickly reap the financial rewards from the high points, fees, or interest, and then collect the balance of the debt by foreclosing on the borrower when, as the lender reasonably should have foreseen, he cannot meet the scheduled payments. The Legislature, equally plainly, was disturbed by mortgage foreclosures of the borrower’s principal dwelling, and thought it unfair for a lender to issue a mortgage loan that the lender reasonably believes will result in foreclosure of the borrower’s home, even if the high cost of the loan fairly reflects the risk of the loan.
The Attorney General has not alleged or sought to prove that the loans at issue in this case were “high cost mortgage loans” governed by the Act. Yet, it is reasonable for this Court to consider whether the loans at issue in this case fall within the “penumbra” of the concept of unfairness reflected in the Act. This Court finds that, as to some types of loans, they do. Under the Act, it was unfair to issue a mortgage loan when the lender reasonably believed that the borrower could not meet the scheduled payments. In the instant case, for those home mortgage loans which:
1. were adjustable rate loans with an introductory period of three years or less (generally, a 2/28 or 3/27 ARM);
2. with an introductory or “teaser” rate for the initial period that was significantly lower than the “fully indexed rate,” that is, at least 3 percent below the “fully indexed rate”;[9]
3. where the debt-to-income ratio would have exceeded 50 percent had Fremont’s underwriters measured the debt, not by the debt due under the teaser rate, but by the debt that would be due at the “fully indexed rate,”
the lender reasonably should have recognized (in the absence of significant liquid or easily liquidated assets) that the borrower would not be able to meet the scheduled payments once the “teaser” rate expired at the close of the introductory period. Loans with these three characteristics, therefore, were doomed to foreclosure unless the borrower was able to refinance the loan at or around the close of the introductory period. If housing prices declined, however, refinancing was not reasonably likely for these loans if they bore a fourth characteristic — a loan-to-value ratio of 100 per *574 cent or a substantial prepayment penalty (that is, a prepayment penalty beyond the “conventional prepayment penalty,” defined in the Act, G.L.c. 183C, §2),[10] or a prepayment penalty that extended beyond the introductoiy period.
Consequently, for loans with these four characteristics, the lender reasonably should have recognized that, after the introductoiy period, the borrower would be unlikely to make the scheduled mortgage payments and the loan was doomed to foreclosure unless the fair market value of the property had increased, thereby enabling the borrower to refinance the loan and obtain a new “teaser” rate for the introductoiy period. Given the fluctuations in the housing market and the inherent uncertainties as to how that market will fluctuate over time, this Court finds that it is unfair for a lender to issue a home mortgage loan secured by the borrower’s principal dwelling that the lender reasonably expects will fall into default once the introductoiy period ends unless the fair market value of the home has increased at the close of the introductoiy period. To issue a home mortgage loan whose success relies on the hope that the fair market value of the home will increase during the introductoiy period is as unfair as issuing a home mortgage loan whose success depends on the hope that the borrower’s income will increase during that same period.[11]
Therefore, just as a high-cost mortgage loan is treated as structurally unfair under the Act if the lender reasonably believed at the time the loan was issued that the borrower would be unable to make the scheduled payments, this Court finds that it is within the penumbra of that concept of unfairness that any mortgage loan secured by the borrower’s principal dwelling should be presumed to be structurally unfair if the loan possesses the four characteristics described above:
1. The loan is an ARM with an introductoiy period of three years or less;
2. The loan has an introductoiy or “teaser” rate for the initial period that is at least 3 percent lower than the fully indexed rate;
3. The borrower has a debt-to-income ratio that would have exceeded 50 percent if the lender’s underwriters had measured the debt, not by the debt due under the teaser rate, but by the debt due under the fully indexed rate; and
4. The loan-to-value ratio is 100 percent or the loan carries a substantial prepayment penalty or a prepayment penalty that extends beyond the introductory period.
The effect of the presumption is to shift the burden of production to the lender to demonstrate that the loan was not actually unfair, perhaps by showing that the borrower had other assets that realistically could have enabled the borrower to meet the scheduled payments and avoid foreclosure, or other reasonable means of obtaining refinancing even if the fair market price of the mortgaged home had fallen. This presumption would not change the burden of proving a Chapter 93A violation; the burden of proving that the loan was unfair remains with the plaintiff borrower.
The Attorney General justly may ask why “stated income” applications loans are not included among the characteristics used to determine whether a loan is presumptively unfair, since “stated income” loans are so prone to foreclosure. The reason is that “stated income” loans are no more prone to foreclosure than full documentation loans if the statements in the application are accurate; they become more prone to foreclosure only if the applicant (or the broker with the acquiescence or ignorance of the applicant) falsely inflates his income or assets. While such loans may not be prudent for a bank to issue because they fail to protect the bank from the risk of fraud, they cannot be said to be unfair to the borrower for this reason. In other words, a borrower may not fairly complain that a bank was unfair to him by giving him an opportunity to lie on his loan application without any meaningful risk of getting caught.
Fremont justly may ask why this Court is extending to all home mortgage loans this principle — that it is unfair for a lender to approve a home mortgage loan secured by the borrower’s principal residence when the lender reasonably should have recognized that the loan is doomed to foreclosure unless the borrower’s income or the fair market value of the residence increases — when the Legislature declared this to be an unfair act only for high-cost mortgage loans. The reason is that this Court does not believe the Legislature believed this practice to be tolerable for mortgage loans that did not meet the definition of high-cost mortgage loans. Rather, this Court believes that the Legislature thought it sufficient to focus on high-cost mortgage loans because it did not imagine that lenders would issue loans with this degree of risk unless they were high-cost mortgage loans. What has changed since the Legislature promulgated the Act is the increasing prevalence of mortgage-backed securities, which enabled lenders such as Fremont to assign large quantities of their high-risk mortgages, take a quick profit, and avoid the risks inherent in the loan.[12] Consequently, since those purchasing the mortgages to package them as mortgage-backed securities were careless in evaluating the risks of these loans, lenders such as Fremont could profit from sub-prime mortgages that fell below the definition of high-risk mortgage loans. As the mortgage market changes, so, too, must the understanding of what lending conduct is unfair.
Fremont also justly may observe that the lending conduct this Court describes as unfair was not generally recognized in the industiy to be unfair at the time these loans were made. Yet, for at least three reasons, this does not mean it is inappropriate for this Court to *575 find its conduct to be unfair. First, as noted earlier, the meaning of unfairness under Chapter 93A is not fixed in stone; nor is it limited to conduct that is unlawful under the common law or prior statutes. See Kattar v. Demoulas, 433 Mass. at 12-13. Rather, it is forever evolving, not only to adapt to changing social, economic, and technological circumstances, but also to reflect what we have learned to be unfair from our experience as a commonwealth. See Nei v. Burley, 388 Mass. 307, 313 (1983) (“This flexible set of guidelines as to what should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms ‘unfair and deceptive’ to grow and change with the times”); Lowell Gas Co. v. Attorney General, 377 Mass. 37, 51 (1979) (citations omitted) (quoting Judge Learned Hand’s view that part of the Federal Trade Commission’s duty is “to discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop”).
Second, Fremont had more than fair warning of the dangers posed by the loans bearing the four characteristics identified above. On October 8, 1999, in its Interagency Guidance on High LTV Residential Real Estate Lending, issued by the United States Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve Board, the FDIC, and the Office of Thrift Supervision, lending institutions were warned:
Recent studies indicate that the frequency of default and the severity of losses on high LTV [loan-to-value] loans far surpass those associated with traditional mortgages and home equity loans. The higher frequency of default may indicate weaknesses in credit risk selection and/or credit underwriting practices, while the increased severity of loss results from deficient collateral protection. In addition, the performance of high LTV borrowers has not been tested during an economic downturn when defaults and losses may increase.
Id. at 2 (footnote omitted). In this report, a high LTV real estate loan was defined as a loan on a residential property that equaled or exceeded 90 percent of the real estate’s appraised value, unless the loan had appropriate credit support, such as mortgage insurance or other readily marketable collateral. Id. at 1. It was reasonable to expect that the frequency of default and the severity of losses would be even greater as the LTV approached 100 percent. Indeed, an Office of the Comptroller of the Currency Advisoiy Letter (AL 2003-2), issued by the Deputy Comptroller for Compliance, dated February 21, 2003 forewarned that it may be found unfair to extend loans bearing the four characteristics identified by this Court:
The terms “abusive lending” or “predatory lending” are most frequently defined by reference to a variety of lending practices. Although it is generally necessary to consider the totality of the circumstances to assess whether a loan is predatory, a fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of the liquidation value of the collateral, without regard to the borrower’s abilfiy to service and repay the loan according to its terms absent resorting to that collateral . . . When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower’s current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower’s equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit. Not surprisingly, such credits experience foreclosure rates higher than the norm.
Id. at 2.
Third, even the federal agencies whose failure to monitor lending practices contributed to the current sub-prime lending crisis now recognize that mortgage loans bearing these four characteristics generally are imprudent and present an unacceptable risk of foreclosure. The most recent Statement on Subprime Mortgage Lending issued on July 10, 2007 by the United States Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve Board, the FDIC, the Office of Thrift Supervision, and the National Credit Union Administration recognizes the “substantial risks to both consumers and lenders” of sub-prime ARM loans bearing certain characteristics, including low teaser rates. Federal Register, Vol. 72, No 131, 37569 (July 10, 2007) at 37572. Specifically, the Statement declares:
Prudent qualifying standards recognize the potential effect of payment shock in evaluating a borrower’s ability to service debt. An institution’s analysis of a borrower’s repayment capacity should include an evaluation of the borrower’s ability to repay the debt by its final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule.
Id. at 37573. Although this Statement did not address specifically whether it would be unfair under consumer protection principles for a lender to approve a loan that the borrower could not afford to repay at the fully indexed rate, the Statement did characterize as a “fundamental consumer protection principle” that loans should be approved “based on the borrower’s ability to repay the loan according to its terms.” Id. at 37574. In essence, now that the foreseeable perils of these sub-prime lending practices have been experienced, to the great detriment of homeowners, financial *576 institutions, the securities market, and the overall economy, these federal agencies have belatedly recognized that it is both imprudent and unfair to approve a mortgage loan that the borrower cannot reasonably be expected to repay if housing prices were to fall. Just because we, as a society, failed earlier to recognize that loans with these four characteristics were generally unfair does not mean that we should ignore their tragic consequences and fail now to recognize their unfairness. In short, approval of loans bearing these four characteristics, in the absence of other liquid or easily liquidated assets or special circumstances, was unfair before and it is unfair today, even if we were too blind earlier to recognize its unfairness.
To be sure, the fact that Fremont’s loans bearing these four characteristics were not generally recognized to be unfair at the time these loans originated is not irrelevant to this Court’s consideration of this case. This Court will certainly take that factor into account in determining what preliminary injunctive remedy is appropriate to address the unfairness.
Moreover, even if a Fremont loan were to be preliminarily found unfair (rather than simply presumptively unfair), that finding does not mean that the borrower is released from his obligation to repay this debt. The borrower received the money that was lent pursuant to a written loan agreement and presumptively is expected to repay the loan. The impact of this preliminary injunction will be nil upon a borrower who can afford to repay the loan; its impact will be felt only by those who cannot afford to repay the loan in full and now face the risk of foreclosure. The reason is that the unfairness of these loans rests in their vulnerability to foreclosure, not in the rate of interest charged or their lending terms.
In determining whether to grant a preliminary injunction, this Court must perform the three-part balancing test articulated in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). First, the court must evaluate the moving party’s claim of injury and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury — losses that cannot be repaired or adequately compensated upon final judgment. Id. at 617 & n.ll. Third, “(i]f the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. at 617. In balancing these factors, “(w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. When the preliminary injunction is sought by the Attorney General, this Court must also consider whether a preliminary injunction would serve the public interest. Commonwealth v. ELM Medical Laboratories, Inc., 33 Mass.App.Ct. 71, 83 (1992). See also Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
This Court finds that the Attorney General is likely to prevail in proving that many of the mortgage loans issued by Fremont secured by the borrower’s primary residence that bear the four characteristics outlined above are not merely presumptively unfair but actually unfair under Chapter 93A. This Court also finds that, with a carefully measured preliminary injunction, the balance of harms favors the Attorney General. This Court recognizes that an overly broad preliminary injunction may not achieve a balance of harms that favors the Attorney General.
The Court’s preliminary injunction shall require the following procedure before Fremont initiates a foreclosure proceeding:
1. Before initiating or advancing a foreclosure on any mortgage loan originated by Fremont that is (a) NOT presumptively unfair, because it does not possess each of the four characteristics identified above, or (b) NOT secured by the borrower’s principal dwelling, or (c) that is secured by a dwelling that is vacant or uninhabitable, Fremont shall first give the Attorney General 30 days advance written notice so that the Attorney General can verify that the proposed foreclosure falls outside the scope of this Preliminary Injunction. If the Attorney General has not given written notice of an objection to Fremont by the 30th day, based on her finding that the loan is presumptively unfair and is secured by the borrower’s principal dwelling and that the dwelling is both inhabited and inhabitable, Fremont may proceed with the foreclosure. If the Attorney General has given written notice of an objection, Fremont shall proceed in accordance with paragraph 2 below.
2. Before initiating or advancing a foreclosure on any mortgage loan originated by Fremont (l)(a) that is presumptively unfair, because it possesses each of the four characteristics identified above, and (b) secured by the borrower’s principal dwelling, and (c) where the dwelling is neither vacant nor uninhabitable, or (2) in which the Attorney General has provided a written objection in accordance with paragraph 1 above, Fremont shall give the Attorney General 45 days advance written notice of the proposed foreclosure, identifying the reasons why foreclosure is reasonable under the circumstances and/or why the Attorney General’s written objection under paragraph 1 above is in error. If the Attorney General has not given written notice of an objection to Fremont by the 45th day, Fremont may proceed with the foreclosure.
3. If the Attorney General has timely given a written objection under paragraph 2 above, the Attorney *577 General and Fremont shall within the next 15 days attempt to resolve their differences regarding the foreclosure. If these differences have been resolved, the Attorney General will notify Fremont in writing that she has withdrawn her written objection. If these differences are not resolved, Fremont may proceed with the foreclosure only with the prior approval of this Court (or a special master appointed by this Court), which it may seek on the 16th day.
4. In considering whether to approve the foreclosure, this Court will determine (a) whether the loan is actually unfair and is actually secured by the borrower’s primary residence that is both inhabited and inhabitable, (b) whether Fremont has taken reasonable steps to “work out” the loan and avoid foreclosure, and (c) whether there is any fair or reasonable alternative to foreclosure. This Court will seek to expedite these decisions but, if the number of such matters grows too large, this Court may need to appoint a special master to assist the Court.
In designing this preliminary injunction, this Court anticipates that Fremont will act responsibly in attempting to “work out” mortgage loans prior to instituting foreclosure, and that the Attorney General will act judiciously in determining which loans do not warrant foreclosure. This Court also recognizes that, while it can establish a process that will permit the parties to resolve the vast majority of these issues, it cannot delegate to any party the power ultimately to determine whether a mortgage loan is actually unfair or whether foreclosure is the proper last resort.
Nothing in this Preliminary Injunction is intended in any way to interfere with or be inconsistent with the FDIC’s Consent Agreement with Fremont. That Consent Agreement expressly declares that its provisions do not bar a state Attorney General from seeking further remedies against Fremont for unfair or deceptive practices. Consent Agreement at 23. Implicitly, if the Attorney General were to prevail, preliminary in-junctive relief ordered by a court to ameliorate the adverse consequences of Fremont’s unfair practices are also not barred by the Consent Agreement. Nor are the terms of this Preliminary Injunction so harsh as to interfere with the FDIC’s objective of restoring Fremont to firmer financial footing through the restoration of sound banking practices.
Finally, this Court emphasizes that borrowers who have received presumptively unfair loans from Fremont should not interpret this preliminary injunction to mean that they have been released from their obligation to repay these loans. They have not been given any such release. Borrowers share with Fremont the responsibility for having entered into a mortgage loan that they now cannot repay. The spirit of this decision is simply that Fremont, having helped borrowers get into this mess, now must take reasonable steps to help them get out of it.
ORDER
For the reasons stated above, this Court hereby ALLOWS the Attorney General’s motion for a preliminary injunction to the extent that, pending final adjudication or further order of this Court, this Court ORDERS as follows:
1. Before initiating or advancing a foreclosure on any mortgage loan originated by Fremont that is (a) NOT presumptively unfair, because it does not possess each of the four characteristics identified above, or (b) NOT secured by the borrower’s principal dwelling, or (c) that is secured by a dwelling that is vacant or uninhabitable, Fremont shall first give the Attorney General 30 days advance written notice so that the Attorney General can verify that the proposed foreclosure falls outside the scope of this Preliminary Injunction. If the Attorney General has not given written notice of an objection to Fremont by the 30th day, based on her finding that the loan is presumptively unfair and is secured by the borrower’s principal dwelling and that the dwelling is both inhabited and inhabitable, Fremont may proceed with the foreclosure. If the Attorney General has given written notice of an objection, Fremont shall proceed in accordance with paragraph 2 below.
2. Before initiating or advancing a foreclosure on any mortgage loan originated by Fremont (l)(a) that is presumptively unfair, because it possesses each of the four characteristics identified above, and (b) secured by the borrower’s principal dwelling, and (c) where the dwelling is neither vacant nor uninhabitable, or (2) in which the Attorney General has provided a written objection in accordance with paragraph 1 above, Fremont shall give the Attorney General 45 days advance written notice of the proposed foreclosure, identifying the reasons why foreclosure is reasonable under the circumstances and/or why the Attorney General’s written objection under paragraph 1 above is in error. If the Attorney General has not given written notice of an objection to Fremont by the 45th day, Fremont may proceed with the foreclosure.
3. If the Attorney General has timely given a written objection under paragraph 2 above, the Attorney General and Fremont shall within the next 15 days attempt to resolve their differences regarding the foreclosure. If these differences have been resolved, the Attorney General will notify Fremont in writing that she has withdrawn her written objection. If these differences are not resolved, Fremont may proceed with the foreclosure only with the prior approval of this Court (or a special master appointed by this Court), which it may seek on the 16th day.
4. In considering whether to approve the foreclosure, this Court will determine (a) whether the loan is actually unfair and is actually secured by the borrower’s primary residence that is both inhabited and inhabitable, (b) whether Fremont has taken *578 reasonable steps to “work out” the loan and avoid foreclosure, and (c) whether there is any fair or reasonable alternative to foreclosure. This Court will seek to expedite these decisions but, if the number of such matters grows too large, this Court may need to appoint a special master to assist the Court.

As has already been noted by the Court, this Consent Agreement was a settlement of the charges brought by the FDIC, without any admission of wrongdoing by Fremont. As a result, this Court does not consider this Consent Agreement to be evidence that Fremont had engaged in any of the conduct it agreed to “cease and desist” from doing in the future. This Court discusses the Consent Agreement, not because it is evidence of Fremont’s past conduct (which it is not), but because it is too important a part of the background and context of this action to be ignored.

Under certain conditions, Fremont could ask the Attorney General to expedite her review of the Loan Documentation and wait only 45 days before commencing a foreclosure proceeding.

 38.4 percent of the loans were fixed rate loans, which this Court assumes were generally not sub-prime. This Court infers that the vast majority of the 64 percent of loans that were ARMs were sub-prime, in large part because a substantial percentage of Fremont’s loans — 38.4% — were “stated income" loans, and this Court expects that all or virtually all of these “stated income” loans were sub-prime ARMs.

For all of Fremont’s originated loans during the relevant time period, which included both fixed rate loans and ARMs, the average debt-to-income ratio was 42.76 percent.

The evidence in the preliminaiy injunction record does not permit this Court to infer the percentage of overall borrowers who would fit into this category, or their overall number. The evidence is sufficient to infer that the number of these borrowers was substantial, based on Fremont’s willingness to lend to poor credit risks and the substantial difference between the debt burden with the introductory rate vs. fully indexed rate.

 30 of the 98 loans were structured to amortize over 40 or 50 years, with a balloon payment due on the 30th year. While it is not surprising to find these loans in trouble, the record sheds no light as to whether extended amortization loans were more difficult to refinance.

 12 imposed prepayment penalties over two years; 1 imposed it only for the first year of the loan.

The affidavit of the Attorney General’s financial investigator who conducted this analysis is unclear as to whether the actual number of the “stated income” loans was 50 or 60. This Court has chosen the lower number, thereby giving Fremont the benefit of the ambiguity.

As an example, if the teaser rate is 7 percent, but the rate will reset to the six-month LIBOR plus a margin of 6 percent, the fully indexed rate will be 11 percent if the six-month LIBOR at the time of the loan origination is 5 percent.

The Act defines a “conventional prepayment penalty” as “any prepayment penalty or fee that may be collected or charged in a home loan, and that is authorized by law other than this chapter, provided the home loan (1) does not have an annual percentage rate that exceeds the conventional mortgage rate by more than 2 percentage points; and (2) does not permit any prepayment fees or penalties that exceed 2 per cent of the amount prepaid." G.L.c. 183C, §2.

 While the fair market value of housing in Massachusetts has risen 603% from 1980 to the third quarter of 2007 (compared to inflation of slightly over 250% during that period), its long-term investment value does not mean that these prices can reliably be expected to increase each year. Office of Federal Housing Enterprise Oversight, Change in OFHEO State House Price Indexes (2007 Q3 Data); Consumer Price Index, Inflation Calculator. Over the past 20 years, housing prices in Massachusetts have fallen twice, in 1989-1992 and 2006-2007. See Kristopher Gerardi, Adam Hale Shapiro, and Paul Willen, “Subprime Outcomes: Risky Mortgages, Homeownership Experiences, and Foreclosures,” Working Papers: Federal Reserve Bank of Boston, www.bos.frb.org/economic/wp/index.htm at 48. Similarly, the New York Stock Exchange’s Dow Jones Index increased 1,678% between the beginning of 1980 and the end of the third quarter of2007, but it, too, experienced three significant periods of negative and/or stagnant growth, in 1978-1982, 1987-1991, and 2001-03. Dow Jones Industrial Average, viewed at finance.yahoo.com/echarts. While in hindsight these price drops may be seen as predictable, considering, in the words of former Federal Reserve Board Chief Alan Greenspan, the “irrational exuberance” of these markets, they are rarely reliably predicted before they happen and do not occur in easily predictable cycles.
The empirical data in the Federal Reserve Bank Working Paper cited above demonstrate the extraordinary impact of falling housing prices on foreclosures. The study estimated that, over the past 12 years, 18 percent of borrowers who purchased their homes with sub-prime mortgages suffered a foreclosure, as compared to only 3 percent who purchased their homes with prime mortgages. Subprime Outcomes at 2. The study found that:
[H]ouse price appreciation plays a dominant role in generating foreclosures: homeowners who have suffered a 20 percent or greater fall in house prices are about fourteen times more likely to default on a mortgage compared to homeowners who have enjoyed a 20 percent increase. We attribute most of the dramatic rise in foreclosures in 2006 and 2007 in Massachusetts to the decline in house prices that began in the summer of 2005. Subprime lending played a role but that role was in creating a class of homeowners who were particularly sensitive to declining house price appreciation, rather than, as is commonly believed, by placing people in inherently problematic mortgages.
Id. at 1. The study also determined that rates of foreclosure “are highly sensitive,” not only to house prices, but “to the initial combined loan-to-value ratio at origination . . .” Id. at 2. The authors wrote:
Subprime lenders created a group of borrowers that were much more likely to default for at least two reasons. First, while they did not invent zero-equity borrowing, they did allow a much larger fraction of borrowers to start homeownership with no cushion against negative [house price appreciation). Second, subprime lenders allowed borrowers with a history of cash flow problems and with monthly payments that exceeded fifty percent of current income to enter homeownership.
Id. at 4. In short, the study confirms the extraordinarily high risk of foreclosure that arises in a volatile housing market when subprime lenders approve loans with the four characteristics identified above.

See Interagency Guidance on Subprime Lending, issued by the United States Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve Board, the FDIC, and the Office of Thrift Supervision, March 1, 1999 at 6 (“Strong demand from investors and favorable accounting rules often allow securitization pools to be sold at a gain, providing further incentive for lenders to expand their sub-prime lending program”).