Fremont-Smith, Thayer, J.
The plaintiff, Amarildo Silva (“Silva”), brings this action against OneWest Bank based on a loan Silva entered into that was secured by a mortgage on his home at 1014 Edgell Road, Framingham, Massachusetts (the “Property”). Silva’s complaint alleges three counts of unfair or deceptive acts in violation of G.L.c. 93A, §2, reformation/ declaratory judgment, and breach of agreement (third-party beneficiary). Before the court is Silva’s motion for a preliminary injunction to prevent foreclosure on the Property. After a hearing, and consideration of the material provided by the parties, this Court finds that Silva has not demonstrated that he has a substantial likelihood of success on the merits. Therefore, the Silva’s motion for a preliminary injunction is DENIED.
FINDINGS OF FACT
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law." Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). Consequently, the preliminary findings of fact below are based on the affidavits, attached exhibits, and motions furnished by the parties, as well as reasonable inferences from that evidence.[1]
On August 25, 2006, Silva executed a mortgage and promissory note of the Property with IndyMac Bank, F.S.B. (“IndyMac”) in the original principal amount of $383,200. A second mortgage was also extended in the amount of $95,000.[2] The underlying loans were “stated income” loans, also referred to as a “no documentation” loan, in which the underwriter for the lender does not require any documentation of the borrower’s income, expenses, or employment. The Uniform Residential Loan Application, which is signed by Silva, lists his monthly income as $9,500 per month, or $114,000 annually, coming from his business, SP Construction Services. The loan application is signed under the pains and penalties of perjury. Silva alleges this listed monthly income amount is “ridiculous on its face and grossly inaccurate.” Attached to the Attested Complaint is Silva’s 2006 Tax Return, which lists Silva’s total income as $55,174, or $4,598 per month. The first loan was amortized over 40 years and includes a balloon payment provision.[3]
Silva alleges that the terms of his loan and the manner in which it would require a balloon payment after a certain period were not conspicuously disclosed, and, had the terms of his loan been disclosed, he never would have entered into the transaction. The Note, however, discloses an initial interest rate of 7.750% and explains the rate would not change for the first seven yeans, and Section 4 of the Note explains that the initial fixed interest rate will change to an adjustable rate on the first day of September 2013, and then could change every year thereafter. The Note disclosed the manner in which the interest rate would adjust based on the six-month London Interbank Offered Rate Index (“LIBOR”) and an added margin of 2.750%. Moreover, a rider, attached to the Mortgage and signed by Silva states that the loan contains aballoon payment feature and is amortized over 40 years.
In early 2008, Silva defaulted on his mortgage, the last payment having been made on February 1, 2008. OneWest is the current holder by assignment of the first Mortgage. Because Silva defaulted, OneWest referred the loan to Harmon Law Offices to proceed with the foreclosure. On September 28, 2009, Harmon Law Offices received a copy of a demand letter under G.L.c. 93A dated May 8, 2009, signed by counsel for Silva and sent to IndyMac. Following the receipt of the copy of the letter, OneWest agreed to cancel the foreclosure sale scheduled for November 16, 2009 to allow for a review of Silva’s loan. The loan review revealed that Silva did not qualify for a loan modification as the investor for the loan did not participate in the Home Affordable Modification Program (HAMP). On January 12, 2010, OneWest’s counsel sent a letter to Silva’s counsel indicating that upon completion of the loan review, it was determined that Silva did not qualify for a loan modification. The letter also addressed the allegations contained in the c. 93A demand letter. The foreclosure on the Property was then scheduled for May 7, 2010, but on May 3, 2010, Silva initiated this action and, on the same day, this Court allowed his motion for a temporary restraining order prohibiting the foreclosure pending a hearing and decision on this motion.
CONCLUSIONS OF LAW
In determining whether to grant a preliminary injunction, this Court must perform the three-part bal *62 ancing test articulated in Packaging Industries Group, 380 Mass. at 616-17. First, the court must evaluate the moving party’s claim of injury and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunctions would subject the moving party to irreparable injury. Id. at 617 & n.11. Third, “[i]f the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. at 617. In balancing these risks, “(w)hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance is in favor of the moving party may a preliminary injunction properly issue.” Id.
Silva argues that his loan is presumptively unfair, and that the contract is illegal, unconscionable, fraudulent, voidable and unenforceable. In Commonwealth v. Fremont Investment & Loan, 452 Mass. 733 (2008), the Supreme Judicial Court held that any mortgage loan secured by the borrower’s principal dwelling would be “presumed to be structurally unfair” for c. 93A purposes if it possesses a combination of all four of the following characteristics:
(1) The loan is an adjustable rate mortgage with an introductory period of three years of less;
(2) The loan features an introductory or “teaser” rate for the initial period that is at least three percent lower than the fully indexed rate, unless the debt-to-income ratio is 55 percent or above, in which case this criterion is eliminated entirely;
(3) The borrower has a debt-to-income ratio that would have exceeded 50 percent if the lender’s underwriters had measured the debt, not by the debt due under the teaser rate, but the debt due under the fully indexed rate (with an exception for student loans); and
(4) The loan-to-value ratio[4] was 100 percent or the loan carries a substantial prepayment penalty or a prepayment penalty that extends beyond the introductory period.
The Court agreed with the Superior Court’s conclusion in Commonwealth v. Fremont Investment & Loan, 23 Mass. L. Rptr. 567, *11 (Mass.Super. 2008), that a mortgage containing all of these characteristics was “doomed to foreclosure” unless the lender could refinance at the end of the introductory rate period, and that this was presumptively unfair to the borrower. The Supreme Judicial Court further held that although the Predatory Home Loan Practice Act, M.G.L.c. 183C was inapplicable because the loan was not a “high cost home mortgage loan”; the same principle, that it is unfair to make a loan where the lender does not reasonably believe that the borrower will be able to repay, should also apply to a c. 93A action. 452 Mass. at 748-49. See: Commonwealth v. H&R Block, 2008 WL 5970550, *43-47 (Mass.Super. 2008) (unpublished) [25 Mass. L. Rptr. 92], modifying the standard outlined in Commonwealth v. Fremont Investment & Loan, 23 Mass. L. Rptr. 567, *11 (Mass.Super. 2008).
The Superior Court in Fremont Investment & Loan supra, declined to find that “stated income” application loans[5] were, on that basis alone, presumptively unfair. 23 Mass. L. Rptr. 567 at *11. “Stated income” loans become more prone to foreclosure only if the applicant (or the broker with the acquiescence or ignorance of the applicant) falsely inflates his income or assets. 23 Mass. L. Rptr. 567 at *11. The court acknowledged that while such loans may not be prudent for a bank to issue because they fail to protect the bank from the risk of fraud, “a borrower may not fairly complain that a bank was unfair to him by giving him an opportunity to lie on his loan application without any meaningful risk of getting caught.” Id. However, the fact that a loan is a “stated income” loan is not irrelevant to the determination of whether the loan was unfair. H&R Block, 2008 WL 5970550, *16. “Stated income” loans maybe unfair or deceptive if the lender used this vehicle to issue loans based on loan applications that it knew or should have known were false, and thereby encouraged or tolerated the borrower’s false representation as to the stated income. Id.
Here, a review of the terms of Silva’s loan does not indicate that the loan possessed the four characteristics found by the Supreme Judicial Court to be presumptively unfair in Fremont. The Note stipulates that the introductory rate of 7.750% would not change for the first 7 years. Section 4 of the Note explains that the initial fixed interest rate would change to an adjustable rate on the first day of September 2013, and then might change every year thereafter. Since the introductory period was longer than three years, Silva cannot satisfy the first prong of the Fremont test.
Nor was the introductory rate of7.750% at least two percent lower than the fully indexed interest rate, so as to satisfy prong two. The 1-year LIBOR in July of 2006 was 5.591%.[6] With an added margin of 2.750% as explained in the Note, the fully indexed rate would be 8.375%.
As for prong three, under the fully indexed rate, Silva’s monthly debt obligation under this loan would total $3,217.51. Silva’s other revolving debt included $ 1,013.15 for the second loan, plus an additional $522 in unsecured debt. Adding the monthly debt obligations under both loans and his unsecured debt, Silva’s monthly obligations totaled $4,752.66, which, using Silva’s listed monthly income of $9,500, makes his debt-to-income ratio approximately 50%. As for prong four, this Court is unable to determine whether the loan-to-value ratio was 100 percent, since there is no *63 evidence to show the value of the Properly at the time of the loan, but there was no substantial prepayment penally. Therefore, Silva has not demonstrated his loan was presumptively unfair under the Fremont test. Nor has Silva provided any statutory authority or case law that supports his contention that the loan was unconscionable because his first loan was to be amortized over 40 years and contained a balloon payment.
Nor is there any indication that IndyMac knew of any misrepresentation of Silva’s income, willfully blinded itself to mortgage brokers who brought loans to it that knowingly inflated the borrower’s income, or encouraged and invited borrowers to submit false information in loan applications so that the loan could be found to have been in reckless disregard of the risk of foreclosure, as envisioned by the Predatory Home Loan Practices Act. Likewise, there is no indication that the bank had any reason to believe that the plaintiff would be unable to repay the loan. Silva signed numerous documents declaring his monthly income to be $9,500. In the absence of fraud, a person who signs a written agreement is bound by its terms regardless of whether the person has read or understood those terms. Tiffany v. Sturbridge Camping Club, Inc., 32 Mass.App.Ct. 173, 175 n.5 (1992). In short, plaintiff has not shown a substantial likelihood of proving that the loan was violative of c. 93A.
Neither has Silva demonstrated that he has a substantial likelihood of proving IndyMac and OneWest did not comply with the HAMP requirements. On January 12, 2010, OneWest sent a letter to Silva’s counsel indicating that it had reviewed Silva’s loan and determined that he did not qualify for a loan modification because the investor for the loan did not participate in HAMP. Silva asserts that OneWest is obligated to use reasonable efforts to remove any prohibitions or impediments to modifying the loan and has not done so, but cites no authority for such an obligation.
ORDER
For the foregoing reasons, it is hereby ORDERED that Silva’s motion for a preliminary injunction be DENIED.[7]

 Silva did not submit an affidavit, motion, or memorandum in support a motion for a preliminary injunction. As such, this Court only has Silva’s Attested Complaint and the Attached Exhibits to consider in support of his position.

 The second mortgage has been charged off as a loss due to extended delinquency and lack of equity.

 An amortized loan is a loan where payments are the same amount each month, but where each payment is comprised of a varying amount of interest and of principal. The amount of each payment which comprises principal increases as the principal balance (and interest thereon) becomes reduced. Where a loan includes a balloon payment, the loan is partially amortized but at the end of the set payment period, a large additional payment, called a balloon payment, is then due.

 The “loan-to-value ratio” is a ratio that compares the amount of the loan with the value of the dwelling or property that secures the loan. Thus, in a loan with a 100% loan-to-value ratio, the loan would provide all the financing needed to purchase the home, i.e., for the entire purchase price of the home, thus allowing a borrower who had little or no savings to purchase a home without any down-payment. If there is more than one loan, the loan-to-value ratio is calculated based on all the mortgage loans securing the home.

 See definition, p. 2, supra.

 OneWest states that the 1-year LIBOR at the time of the inception of the loan was 5.4501%.

 This decision does not mean that, after further discovery, the loan might not be shown to have been predatory so that Silva’s promissory note might be shown to be unenforceable.